**FEDERAL TRADE COMMISSION,**
Plaintiff-Appellant,

v.

**STERLING DRUG, INC., Dancer-Fitzgerald-Sample, Inc., and Thompson-Koch Company, Defendants-Appellees.**

No. 370, Docket 28118.

United States Court of Appeals
Second Circuit.

Argued April 18, 1963.

Decided May 6, 1963.

Harold D. Rhynedance, Jr., Washington, D. C. (James McI. Henderson, Gen. Counsel, and J. B. Truly, Asst. Gen. Counsel, on the brief), for plaintiff-appellant.

Mathias F. Correa, of Cahill, Gordon, Reindel & Ohl, New York City (Thomas C. Mason and H. Richard Schumacher, New York City, on the brief), for defendants-appellees Sterling Drug, Inc. and Thomas-Koch Co.

Frank A. F. Severance, of Dunnington, Bartholow & Miller, New York City (Gordon M. Lucey, New York City, of counsel), for defendant-appellee Dancer-Fitzgerald-Sample, Inc.

Before SMITH, KAUFMAN and MARSHALL, Circuit Judges.

KAUFMAN, Circuit Judge.

The Federal Trade Commission, appellant here, instituted an action in the District Court for the Southern District of New York praying for a temporary injunction designed to prevent the dissemination of what the Commission alleged it had reason to believe was false and misleading advertising. Judge Dawson denied the injunction, 215 F.Supp. 327 (S.D.N.Y.1963), holding that the Commission had failed to make the showing required by the Federal Trade Com-

mission Act, 15 U.S.C. § 53. We agree, and affirm the order denying the temporary injunction.

Section 5(a) (1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a) (1), declares unlawful "unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce * * *, " and proceeds to repose in the Commission the power to prevent such acts or practices, 15 U.S.C. § 45(a) (6). One such "unfair or deceptive act or practice" is defined in section 12, 15 U.S.C. § 52, as the dissemination of "any false advertisement" likely to induce the purchase of food, drugs, or cosmetics. The act expressly defines "false advertising" in section 15(a) (1), 15 U.S.C. § 55(a) (1), as an advertisement which is misleading in a material respect. Congress gave to the Commission the power to issue an administrative complaint and conduct a hearing whenever it has "reason to believe" that statutory violations such as false advertising are being committed. 15 U.S.C. § 45(b). In the usual case, the conduct of such a hearing, followed where appropriate by an administrative order prohibiting or modifying the advertising in question, is sufficient to guard the public from the evils proscribed by Congress in the act. Should the Commission feel, however, that delay during the pendency of administrative proceedings will work prejudice to the public due to the continued circulation of purportedly misleading advertising, it has available the recourse to the federal district court for a temporary injunction provided in section 13(a) of the act, 15 U.S.C. § 53(a):

> "Whenever the Commission has reason to believe * * * that any person * * * is engaged in, or is about to engage in, the dissemination or the causing of the dissemination of any advertisement in violation of section 52 of this title, and * * * that the enjoining thereof pending [administrative proceedings] * * * would be to the interest of the public, the Commission * * * may bring suit in a district court of the United

States * * * to enjoin the dissemination or the causing of the dissemination of such advertisement. Upon proper showing a temporary injunction or restraining order shall be granted without bond."

■ The interpretation and application of section 13(a) is at the heart of this dispute between the Commission and the defendants-appellees, Sterling Drug, Inc., the manufacturer of Bayer Aspirin, and Dancer-Fitzgerald-Sample, Inc. and Thompson-Koch Company, advertising agencies employed by Sterling Drug. The Commission referred in the court below to an advertisement in Life Magazine, published in January 1963, which summarized the results of a scientific investigation of five leading analgesic products, their efficacy in bringing about relief from pain and their tendency to cause stomach upset; it was this advertisement which the Commission alleged it had reason to believe was false and misleading and designed to induce the purchase of Bayer Aspirin. Judge Dawson remained unconvinced that the Commission was reasonable in its belief that the public would be misled by the advertisement in question, and denied the injunction for failure to make a "proper showing" under section 13(a) of the act. This court "will not ordinarily interfere with the action of a trial court either in granting or withholding an injunction * * * and will not reverse such an order unless it appears that there was a palpable misapplication of well-settled rules of law on the part of the trial judge * * *." Federal Trade Commission v. Rhodes Pharmacal Co., 191 F.2d 744, 746–747 (7th Cir., 1951). We do not believe that Judge Dawson's conclusion was a "palpable misapplication" of the statutory standard or that he was "clearly erroneous" in finding as he did, Fed.R.Civ.P. 52(a).

## I.

The controversy has its roots in the December 29, 1962 issue of the Journal of the American Medical Association, which carried an article written by two physi-

cians and a medical statistician,[1] titled "A Comparative Study of Five Proprietary Analgesic Compounds." The article analyzed the results of a study made of the efficacy as well as the unhappy after-effects of certain pain-relieving drugs, sold in pharmacies and supermarkets throughout the nation. These five were Bayer Aspirin, St. Joseph's Aspirin, Bufferin (aspirin with buffering agent), and two of the so-called "combination of ingredients" tablets, Anacin and Excedrin. Also used in the experiment, as a form of control, was a placebo, the name given a harmless non-medicinal substance administered in the form of a pill for those pill-poppers whose ailment is without organic origin and whose pain seems to be relieved by following the ritual of downing a tablet irrespective of size, shape, or content which the user believes has qualities of medicinal value; the placebo utilized by the three researchers was composed of lactose, or milk sugar, and a conventional cornstarch binder. After investigating the efficacy of the five analgesic agents as pain relievers, the study noted, "The data failed to show any statistically significant difference among any of the drugs (that is, excluding the placebo) at any of the check points [fifteen minutes through four hours] * * * [T]here are no important differences among the compounds studied in rapidity of onset, degree, or duration of analgesia." Fifteen minutes after the drugs were administered, so-called "pain-relief scores" were computed, and Bayer earned a score of 0.94, while the next most effective drug at that point in time, Excedrin, earned a score of 0.90; the others were rated at 0.76 and lower. The chart on

which these figures appeared indicated that the "standard error of mean," or the margin of statistical accuracy of the study, was 0.124. Upon investigating the incidence of stomach upset after the administration of the five drugs as well as the placebo, the researchers came to this conclusion: "Excedrin and Anacin form a group for which the incidence of upset stomach is significantly greater than is the incidence after Bayer Aspirin, St. Joseph's Aspirin, Bufferin, or the placebo. The rates of upset stomach associated with these last 4 treatments are not significantly different, one from the other." The accompanying table revealed that of the 829 doses taken of Bayer Aspirin, there were nine episodes of upset stomach, a rate of 1.1%; the placebo was administered in 833 cases, and caused stomach upset but seven times, a rate of 0.8%. The article concluded by stating, "This study was supported by a grant from the Federal Trade Commission, Washington, D. C."[2]

It is not difficult to understand the heartwarming reception this article received in the upper echelons of Sterling and its Madison Avenue colleagues; no sooner were the results of the study published in the Journal of the American Medical Association when Sterling Drug and its advertising agencies decided to make the most of them. This decision, we may fairly assume, did not surprise Sterling's competitors. The public had long been saturated with various claims proved by the study to be of doubtful validity. One of the products had boasted in its advertisements that it "works twice as fast as aspirin," and "protects you against the stomach distress you can get from aspirin alone";

---

1. Dr. DeKornfeld was then chief of the department of anesthesiology, Baltimore City Hospitals. Dr. Lasagna was affiliated with Johns Hopkins School of Medicine. Mr. Frazier was director of the Bureau of Biostatistics, Baltimore City Health Department.

2. We find support in the record for the article's statement regarding the Commission's involvement in the study. For in

January 1963, the Chairman of the Federal Trade Commission appeared before a special committee of the Senate, and testified, in response to the question "I understand that the Aspirin study was financed at least in part by a Federal Trade Commission grant. Is that so?" that "[W]e had these tests made, sir * * * we paid for the study. We obtained and entered into a contract to get that study made."

another, that it "does not upset the stomach" and "is better than aspirin"; and yet another, that it is "50% stronger than aspirin." Believing that the Judgment Day has finally arrived and seeking to counteract the many years of hard-sell by what it now believed to be the hard facts, Sterling and its co-defendants prepared and disseminated advertising of which the following, appearing in Life Magazine and numerous newspapers throughout the country, is representative:

"GOVERNMENT-SUPPORTED MEDICAL TEAM COMPARES BAYER ASPIRIN AND FOUR OTHER POPULAR PAIN RELIEVERS."

"FINDINGS REPORTED IN THE HIGHLY AUTHORITATIVE JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION REVEAL THAT THE HIGHER PRICED COMBINATION-OF-INGREDIENTS PAIN RELIEVERS UPSET THE STOMACH WITH SIGNIFICANTLY GREATER FREQUENCY THAN ANY OF THE OTHER PRODUCTS TESTED, WHILE BAYER ASPIRIN BRINGS RELIEF THAT IS AS FAST, AS STRONG, AND AS GENTLE TO THE STOMACH AS YOU CAN GET."

"This important new medical study, supported by a grant from the federal government, was undertaken to compare the stomach-upsetting effects, the speed of relief, and the amount of relief offered by five leading pain relievers, including Bayer Aspirin, aspirin with buffering, and combination-of-ingredients products. Here is a summary of the findings.

"UPSET STOMACH

"According to this report, the higher priced combination-of-ingredients products upset the stomach with significantly greater frequency than any of the other products tested, while Bayer Aspirin, taken as directed, is as gentle to the stomach as a plain sugar pill.

"SPEED AND STRENGTH

"The study shows that there is no significant difference among the products tested in rapidity of onset, strength, or duration of relief. Nonetheless, it is interesting to note that within just fifteen minutes, Bayer Aspirin had a somewhat higher pain relief score than any of the other products.

"PRICE

"As unreasonable as it may seem, the products which are most likely to upset the stomach—that is, the combination-of-ingredients products—actually cost substantially more than Bayer Aspirin. The fact is that these products, as well as the buffered product, cost up to 75% more than Bayer Aspirin."

## II.

In a proceeding such as this, the burden was upon the Commission, in seeking its temporary injunction against the advertising, to show that it had "reason to believe" that the advertisements were false and misleading, and that the injunction during the pendency of administrative proceedings which the Commission initiated against Sterling Drug in January 1963 "would be to the interest of the public."

The Commission alleged and sought to prove that the appellees' advertisements falsely represented, directly and by implication: (a) that the findings of the medical research team were endorsed and approved by the United States Government; (b) that the publication of the article in the Journal of the American Medical Association is evidence of endorsement and approval thereof by the association and the medical profession; (c) that the research team found that Bayer Aspirin is not upsetting to the stomach and is as gentle thereto as a sugar pill; (d) that the research team found that Bayer Aspirin, after fifteen minutes following administration, affords a higher degree of pain relief than any other product tested. An injunction was alleged to be in the public interest, since the consuming public would otherwise unwarrantedly rely upon the advertising to their "irreparable injury," and

since competitors of Sterling Drug might be encouraged to engage in similar advertising tactics in order to maintain competitive standing.

 The legal principles to be applied here are quite clear. The central purpose of the provisions of the Federal Trade Commission Act under discussion is in effect to abolish the rule of *caveat emptor* which traditionally defined rights and responsibilities in the world of commerce. That rule can no longer be relied upon as a means of rewarding fraud and deception, Federal Trade Commission v. Standard Education Society, 302 U.S. 112, 116, 58 S.Ct. 113, 82 L.Ed. 141 (1937), and has been replaced by a rule which gives to the consumer the right to rely upon representations of facts as the truth, Goodman v. Federal Trade Commission, 244 F.2d 584, 603 (9th Cir., 1957). In order best to implement the prophylactic purpose of the statute, it has been consistently held that advertising falls within its proscription not only when there is proof of actual deception but also when the representations made have a capacity or tendency to deceive, i. e., when there is a likelihood or fair probability that the reader will be misled. See American Life & Accid. Ins. Co. v. Federal Trade Commission, 255 F.2d 289, 293 (8th Cir.), cert. denied 358 U.S. 875, 79 S.Ct. 115, 3 L.Ed.2d 105 (1958); Charles of the Ritz Distributors Corp. v. Federal Trade Commission, 143 F.2d 676, 680 (2d Cir., 1944); Herzfeld v. Federal Trade Commission, 140 F.2d 207 (2d Cir., 1944). For the same reason, proof of intention to deceive is not requisite to a finding of violation of the statute, Gimbel Bros., Inc. v. Federal Trade Commission, 116 F.2d 578 (2d Cir., 1941); since the purpose of the statute is not to punish the wrongdoer but to protect the public, the cardinal factor is the probable effect which the advertiser's handiwork will have upon the eye and mind of the reader. It is therefore necessary in these cases to consider the advertisement in its entirety and not to engage in disputatious dissection. The entire mosaic should be viewed rather than each tile separately. "[T]he buying public does not ordinarily carefully study or weigh each word in an advertisement. The ultimate impression upon the mind of the reader arises from the sum total of not only what is said but also of all that is reasonably implied." Aronberg v. Federal Trade Commission, 132 F.2d 165, 167 (7th Cir., 1942).

Unlike that abiding faith which the law has in the "reasonable man," it has very little faith indeed in the intellectual acuity of the "ordinary purchaser" who is the object of the advertising campaign.

"The general public has been defined as 'that vast multitude which includes the ignorant, and unthinking and the credulous, who, in making purchases, do not stop to analyze but too often are governed by appearances and general impressions.' The average purchaser has been variously characterized as not 'straight thinking,' subject to 'impressions,' uneducated, and grossly misinformed; he is influenced by prejudice and superstition; and he wishfully believes in miracles, allegedly the result of progress in science * * *. The language of the ordinary purchaser is casual and unaffected. He is not an 'expert in grammatical construction' or an 'educated analytical reader' and, therefore, he does not normally subject every word in the advertisement to careful study."

1 Callman, Unfair Competition and Trademarks § 19.2(a) (1), at 341–44 (1950), and the cases there cited.[3]

 It is well established that advertising need not be literally false in

---

**3.** See Federal Trade Commission v. Standard Education Society, 302 U.S. 112, 116, 58 S.Ct. 113, 82 L.Ed. 141 (1937); Exposition Press, Inc. v. Federal Trade Commission, 295 F.2d 869, 872 (2d Cir., 1961), cert. denied, 370 U.S. 917, 82 S.Ct. 1554, 8 L.Ed.2d 497 (1962); Niresk Industries, Inc. v. Federal Trade Commission, 278 F.2d 337, 342 (7th Cir.), cert. denied, 364 U.S. 883, 81 S.Ct. 173, 5 L.

order to fall within the proscription of the act. Gone for the most part, fortunately, are the days when the advertiser was so lacking in subtlety as to represent his nostrum as superlative for "arthritis, rheumatism, neuralgia, sciatica, lumbago, gout, coronary thrombosis, brittle bones, bad teeth, malfunctioning glands, infected tonsils, infected appendix, gall stones, neuritis, underweight, constipation, indigestion, lack of energy, lack of vitality, lack of ambition and inability to sleep * * *." See Federal Trade Commission v. National Health Aids, Inc., 108 F.Supp. 340, 342 (D.Md. 1952). The courts are no longer content to insist simply upon the "most literal truthfulness," Moretrench Corp. v. Federal Trade Commission, 127 F.2d 792 at 795, for we have increasingly come to recognize that "Advertisements as a whole may be completely misleading although every sentence separately considered is literally true. This may be because things are omitted that should be said, or because advertisements are composed or purposefully printed in such way as to mislead." Donaldson v. Read Magazine, 333 U.S. 178, 188, 68 S.Ct. 591, 597, 92 L.Ed. 628 (1948). See also Handler, supra note 3, 6 Law & Contemp. Prob. at 99. There are two obvious methods of employing a true statement so as to convey a false impression: one is the half truth, where the statement is removed from its context and the nondisclosure of its context renders the statement misleading, see P. Lorillard Co. v. Federal Trade Commission, 186 F.2d 52, 58 (4th Cir., 1950); a second is the ambiguity, where the statement in context has two or more commonly understood meanings, one of which is deceptive.

### III

The Federal Trade Commission asserts here that the vice of the Bayer advertisement is of these types. It concedes that none of the statements made therein is literally false, but it contends that the half-truths and ambiguities of the advertisement give it "reason to believe" that our hypothetical, sub-intelligent, less-than-careful reader will be misled thereby. Thus, we are told that the reference in large type to a "Government-Supported Medical Team" gives the misleading impression that the United States Government endorsed or approved the findings of the research team. Surely the fact that the word "supported" might have alternative dictionary definitions of "endorsed" or "approved" is not alone sufficient to show reason to believe that the ordinary reader will probably construe the word in this manner. Most words *do* have alternative dictionary definitions; if that in itself were a sufficient legal criterion, few advertisements would survive. Here, no impression is conveyed that the *product itself* has its source in or is being endorsed by the Government; for this reason, the cases cited by the Commission are inapt. If the reader of the advertisement believes that the Government in some way vouched for the soundness of the study's conclusions, then this impression would have also been conveyed had the advertisement "told the whole story," relating in full detail the extent of the Commission's participation: it selected the research team, supported the study with a grant, and authorized the publication of the report. The capsulized expression "Government-Supported" can not, therefore, be characterized as misleading. The Commission indicated to us upon argument that it would have been equally unhappy had the advertisement stated that the medical team was "Government-Financed" or "Government-Subsidized." But surely the concise statement of an established fact, immediately thereafter expanded—"This

Ed.2d 104 (1960); Book-of-the-Month Club, Inc. v. Federal Trade Commission, 202 F.2d 486 (2d Cir., 1953); Moretrench Corp. v. Federal Trade Commission, 127 F.2d 792, 795 (2d Cir., 1942); Charles of the Ritz Distributors Corp. v.

Federal Trade Commission, supra; Florence Mfg. Co. v. J. C. Dowd & Co., 178 F. 73, 75 (2d Cir., 1910); Handler, "The Control of False Advertising under the Wheeler-Lea Act," 6 Law & Contemp. Prob. 91, 98 (1939).

important new medical study, supported by a grant from the federal government * * * "—cannot fairly be proscribed by the Commission; the alternatives are complete omission of the admittedly true statement or long-winded qualification and picayune circumlocution, neither of which we believe was in the contemplation of Congress.

The Commission's attack upon the use of the phrase "Findings reported in the highly authoritative Journal of the American Medical Association," as misleadingly connoting endorsement and approval, is similarly unfounded, for much the same reasons already discussed. To assert that the ordinary reader would conclude from the use of the word "authoritative" that the study was endorsed by the Journal and the Association is to attribute to him not only a careless and imperceptive mind but also a propensity for unbounded flights of fancy. This we are not yet prepared to do. If the reader's natural reaction is to think that the study, because of publication in the Journal, is likely to be accurate, intelligent, and well-documented, then the reaction is wholly justified, and one which the advertiser has every reason to expect and to seek to inculcate. We, as judges, know that an article on the law which has survived the rigorous selection and editing process of one of the major law publications is most probably more reliable and more thoroughly researched than the report of a recent trial or judicial decision carried in the Podunk Daily Journal. But we hardly think that there is "reason to believe" that either we or the lay observer would tend to construe the views expressed in the article as having secured the wholehearted endorsement and approval of the "authoritative" periodical in which it appears.[4]

The Commission's third objection deals with the probable vulnerability of the ordinary reader to Bayer's representations concerning stomach upset. We pass without comment the Commission's claim that the Bayer advertisement represented that no other available analgesic product was more gentle to the stomach; clearly, any comparative statements made in the advertisement could only be understood to refer to the four other products tested. More seriously pressed upon us is the claim that the reader will be deceived by the statement that "Bayer Aspirin, taken as directed, is as gentle to the stomach as a plain sugar pill." "Sugar pill", we are told, is misleading terminology; the advertisement should have used the word "placebo". Again, we are confronted by a simple problem of communication. For how can we expect our hypothetically slow-witted reader to react when he reads that "Bayer Aspirin is as gentle to the stomach as a placebo"! Most likely, he will either read on, completely unaware of the significance of the statement, or impatiently turn the page. Perhaps he will turn to his neighbor, and in response to a request for a definition of the troublesome word be greeted with the plausible query, "A *what*?" (This assumes that the reader will have been able to muster the correct pronounciation of the word.) But, all this aside, the pill used as a control in this case was indeed constituted of milk sugar, and the use of the term "sugar pill" was neither inaccurate nor misleading.

The Commission next shifts its focus to the words "as gentle as," alleging that it has reason to believe that the reader will conclude that Bayer is not in the slightest bit harmful to the stomach; this can be rectified, we are told, by stating that Bayer is "no more upsetting"

4. It is interesting to note that the American Medical Association, contemporaneously with the publication of the issue of the Journal in which the findings appeared, transmitted a press release throughout the country which called attention to the study, the fact of its publication in the Journal, and a detailed summary of its findings. Subsequently, the AMA issued another press release, claiming that certain current advertising had been misinterpreted as statements of AMA endorsement of Bayer Aspirin. We note, however, that the press release, although disclaiming endorsement of the product itself, did not question either the findings of the article or the responsibility of the AMA in publishing them.

than the placebo, which did in fact cause a very minor degree of stomach upset. Unlike the standard of the average reader which the Commission avidly endorses throughout these proceedings, it here would have us believe that he is linguistically and syntactically sensitive to the difference between the phrases "as gentle as" and "no more upsetting than." We do not find that the Commission has reason to believe that this will be the case, and we therefore reject its contentions.

Finally, the Commission attacks the manner in which the Bayer advertisement treated the results of the study on speed and effectiveness of pain relief. As we understand the Commission's argument, no objection is taken to the statement that "The study shows that there is no significant difference among the products tested in rapidity of onset, strength, or duration of relief." Indeed, no objection can properly be taken, for the statement reproduces almost verbatim one of the conclusions enumerated in the article. It is thought, however, that the advertisement improperly represents greater short-run pain relief with Bayer Aspirin by stating that "Nonetheless, it is interesting to note that within just fifteen minutes, Bayer Aspirin had a somewhat higher pain relief score than any of the other products." As we have seen, the statement is literally true, for Bayer's "score" after fifteen minutes was 0.94 while its closest competitor at that time interval was rated 0.90. The fact that the margin of accuracy of the scoring system was 0.124—meaning that the second-place drug might fare as well as or better than Bayer over the long run of statistical tests—does not detract from the fact that on this particular test, Bayer apparently fared better than any other product in relieving pain within fifteen minutes after its administration. It is true that a close examination of the statistical chart drawn up by the three investigators reveals that they thought the difference between all of the drugs at that time interval not to be "significantly different." But that is precisely what the Bayer advertisement stated in the sentence preceding its excursion into the specifics of the pain-relief scores. We cannot, therefore, conclude that Judge Dawson clearly erred in finding that the Commission failed properly to carry its statutory burden of proof, however slim that burden might be. Not even the Commission contends that in a proceeding under section 13(a) the judge is merely a rubber stamp, stripped of the power to exercise independent judgment on the issue of the Commission's "reason to believe."

The Commission relies heavily, especially as to the pain-relief aspects of its case, upon P. Lorillard Co. v. Federal Trade Commission, 186 F.2d 52 (4th Cir., 1950). There, Reader's Digest sponsored a scientific study of the major cigarettes, investigating the relative quantities of nicotine, tars, and resins. It accompanied its conclusions with a chart which revealed that, although Old Gold cigarettes ranked lowest in these deleterious substances, the quantitative differences between the brands were insignificant and would have no effect in reducing physiological harm to the smoker. The tenor of the study is revealed by its cheery words to the smoker "who need no longer worry as to which cigarette can most effectively nail down his coffin. For one nail is just about as good as another." Old Gold trumpeted its dubious success, claiming that it was found lowest in nicotine, tars, and resins, and predicting that the reader upon examining the results of the study would say "From now on, my cigarette is Old Gold." The Court quite properly upheld a cease and desist order issued by the Commission. An examination of that case shows that it is completely distinguishable in at least two obvious and significant respects. Although the statements made by Old Gold were at best literally true, they were used in the advertisement to convey an impression diametrically opposed to that intended by the writer of the article. As the Court noted, "The company proceeded to advertise this difference as though it had

received a citation for public service instead of a castigation from the Reader's Digest." 186 F.2d at 57. Moreover, as to the specifics of brand-comparison, it was found that anyone reading the advertisement would gain "the very definite impression that Old Gold cigarettes were less irritating to the throat and less harmful than other leading brands of cigarettes. * * * The truth was exactly the opposite." 186 F.2d at 58. In the instant case, Sterling Drug can in no sense be said to have conveyed a misleading impression as to either the spirit [5] or the specifics of the article published in the Journal of the American Medical Association.

## IV

The Commission makes much of the fact that Judge Dawson, at the conclusion of his opinion, discussed the Commission's probable success in its pending administrative proceedings and "balanced the equities" of the respective parties; it urges that he thereby applied erroneous principles of law in denying the injunction. The Commission contends that a preliminary injunction under section 13(a) should issue immediately upon a showing that the specific requirements of the act—"reason to believe" and "interest of the public"—have been met, and that matters usually considered in the traditional equity suit are irrelevant. This question has been a source of some conflict in the courts, compare Federal Trade Commission v. Rhodes Pharmacal Co., 191 F.2d 744 (7th Cir., 1951), with Federal Trade Commission v. National Health Aids, Inc., 108 F.Supp. 340, 346 (D.Md.1952). See also Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944); Federal Trade Commission v. Thomsen-King & Co., 109 F.2d 516, 519 (7th Cir., 1940); 65 Harv.L.Rev. 349 (1951); but we do not believe Judge Dawson rested his holding on these grounds. In any event, since we find, as did Judge Dawson, that

the commission failed in the initial step of making a proper showing that it had reason to believe the advertisements were false and misleading, it is unnecessary to resolve the question here raised.

Our affirmance of the order of the District Court should not, however, be thought to render fruitless the Commission's activities in its pending administrative proceeding against Sterling Drug, Inc. Should further evidence there be adduced in support of its allegations of violation of the Federal Trade Commission Act, a cease and desist order may well be valid and its issuance properly sustained upon judicial review. We are sympathetic with the Commission's commendable efforts in carrying out the important tasks assigned to it by Congress; we simply hold that in this case, it has failed to make that showing which Congress itself deemed requisite to judicial relief.

Affirmed.

MARSHALL, Circuit Judge (concurring).

In order to obtain a preliminary injunction of this type the Federal Trade Commission was required to show that it had "reason to believe" that appellee was using advertising in violation of the Act, and had to do so by a "proper showing" thereof. 15 U.S.C.A. § 53. Judge Dawson found that the Commission had failed to make such a showing. We are convinced that his conclusions were not clearly erroneous. Even in this type of statutory proceeding for the benefit of the public, as contrasted to the ordinary private injunction proceeding, we should be careful to go no further than is necessary in the initial preliminary stage of what will no doubt be long and protracted administrative and court proceedings. While I concur in the result, I would not want it construed as pre-judging the determination of the Commission in advance of such hearing.

5. The Commission makes no contention here that the allegedly misleading advertising will cause or induce physical harm.