**IMPERIAL CHEMICAL INDUSTRIES, PLC, Plaintiff,**

v.

**BARR LABORATORIES, Defendant.**

**No. 87 Civ. 7833 (VLB).**

United States District Court, S.D. New York.

April 20, 1992.

Lawrence A. Hymo, Cushman, Darby & Cushman, Washington, D.C., James F. Rittinger, Satterlee, Stephens, Burke & Burke, New York City, for plaintiff.

Myron Cohen, Cohen, Pontani & Lieberman, New York City, for defendant.

## OPINION

VINCENT L. BRODERICK, Senior District Judge.

### I

This case involves the issue of whether a patent on a pharmaceutical product can be sustained where information containing test results on a given species of animals contrary to the results intended to occur in humans, was deliberately withheld from the patent examiner, and was not reflected in the patent as issued. This opinion contains my findings of fact and conclusions of law, some of which are summarized or elaborated in the appendix. I find the existence of all the facts set forth by clear and convincing evidence. This court has jurisdiction of the matter pursuant to 28 U.S.C. 1331.

### II

Under the Patent Clause of the Constitution implemented by the Patent Code enacted by Congress, the people of the United States offer an inventor protection against competition for a limited period in exchange for disclosure to the public of how to practice the patent and the best mode of using it. The granting of the patent monopoly is contingent upon the applicant disclosing to the Patent Examiner information needed to determine if the invention is novel, nonobvious and useful, without deliberately withholding material facts in a fraudulent manner. One of the main reasons for the Patent Code is to encourage inventors to make the necessary disclosures to permit others to advance the art; inventors may not keep secret information essential for that purpose. The plaintiff here failed to fulfill that obligation.

The patentee in this case failed to live up to its side of the bargain by making required disclosures. It therefore may not retain or enforce the protection against rivalry in making and selling a patented product which might otherwise be available.

The patent involved covers tamoxifen, which is widely used as a treatment for breast cancer and is under study as a possible preventive for it. Information important to the proper use and evaluation of this product was knowingly and improperly withheld from the Patent and Trademark Office ("PTO") and readers of the patent. To avoid misconstruction of these facts, they do not mean that the product as currently used is not safe and effective. It is the behavior of the plaintiff-patentee, the inadequacy of its disclosures some years ago and its deliberate withholding of known information which is the focus of my attention, leading to a finding that the patent is invalid and unenforceable.

Nothing contained in this opinion suggests, or is intended to suggest, that the drug "tamoxifen" is not safe or not effective. My focus has been on the comportment of the patent applicant, and not on issues of safety or effectiveness, which are issues appropriately dealt with by the Food and Drug Administration.

### III

Plaintiff Imperial Chemical Industries, PLC ("ICI") obtained U.S. Patent 4,536,516 (meant when the term "the patent" is employed here unless some other modifier is used). The patent (Plaintiff's exhibit, "PEX" 200, identified at Tr. 1410 by an ICI witness), covering tamoxifen (sometimes referred to below as "the product") was

issued on August 20, 1985 pursuant to application Serial Number ("SN") 600,224. Plaintiff asserts the benefit of an earlier initial submission date of August 26, 1963 based on SN 304,652.[1] Numerous intervening continuation applications were filed by ICI, leading to rejections and on March 15, 1984 to a decision of the United States District Court for the District of Columbia declining to order the PTO to grant one of the intermediate applications (S.N. 486,913). This ruling was reversed by the Court of Appeals for the Federal Circuit on February 15, 1985, and the patent in suit was issued.[2]

Thereafter defendant Barr Laboratories, Inc. ("Barr") challenged ICI's patent through an Abbreviated New Drug Application for a generic version of tamoxifen, constituting a technical infringement under 35 U.S.C. 271(e)(2), enacted by the Waxman–Hatch Drug Price Competition and Patent Restoration Act, Pub.Law No. 98–417, 98 Stat. 1585 (1984), leading to this suit; see generally Wheaton, "Generic Competition and Pharmaceutical Innovation: The Drug Price Competition and Patent Term Restoration Act of 1984," 35 Cath.U.L.Rev. 433 (1986).

## IV

■ The effects of tamoxifen on human hormonal balance are crucial to its proper use. Without knowledge of such effects, unpredictable and at times disastrous consequences could well follow, rather obviously defeating the original purposes of administering the preparation.

Test results showing hormonal effects of tamoxifen in mice which were opposite to those in rats and opposite to those sought in humans, were known to ICI. Defense Exhibits ("DEX") 37, 41, 62. This information was deliberately withheld from a June 1966 affidavit of Arthur Leonard Walpole in S.N. 304,652 (DEX 1, the "Walpole Affidavit" sometimes also called the Walpole Declaration) submitted to the PTO. See Tr. 1450–60.

Reference to these test results and to differences in effects of the product in differing species, were also omitted from the patent specifications disclosed to the public under 35 U.S.C. 112 (PEX 200). Indeed, the patent referred to test results in rats (id., 2, col. 2) which were consistent with the function sought in humans, but deliberately omitted the contrary results observed in mice of which ICI was aware.

The Walpole Affidavit was signed on April 29, 1966. PEX 220, page 572, contains a handwritten note by Dr. Alan Laird, an ICI witness at the trial concerning a discussion with a Doctor Lanquist about information excluded from the Walpole Affidavit which states:

"... the results with mice, which are incomplete and unhelpful, should be omitted."

The following testimony ensued:

Q (by ICI counsel) ... Did you follow that instruction?

A Yes. Your Honor, I followed that instruction or indeed advice because I feel that was a statement that followed from the data provided.

According to PEX 201, p. 109, as of July 1966, "The arguments for patentability are based in toto on the Walpole Rule 132 affidavit." See direct examination of ICI witness Alan Laird, Tr. 1417; see also id. 1419.

DEX 32 shows that ICI engaged in further mouse research after the submission

---

**1.** It was important for plaintiff to be able to relate its application back to the 1963 submission date because of intervening patents which were issued by the United Kingdom and Belgium.

**2.** The information discussed in this opinion, concerning withholding of certain data from the PTO and omission of references to that data in the specifications disclosed to the public, was not before the district court or the Federal Circuit in that litigation, which was between the plaintiff here and the PTO. In regard to matters which were before the Federal Circuit, I give the result reached great weight even though, of course, defendant Barr was not a party to that litigation and hence not bound. See *Martin v. Wilks*, 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989); *Hansberry v. Lee*, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940).

of the Walpole Affidavit, confirming that ICI recognized its importance.

ICI has contended that the mouse data, and the opposing effects of the product in different species, are irrelevant. Such negative information, however, is crucial to the proper use of the invention in its best mode. Such information would, moreover, have provided the patent examiner with background information essential to evaluation of tamoxifen. It would have played an essential role in facilitating determination by the patent examiner of the novelty, nonobviousness and usefulness of the invention under the Patent Code.

Patent claims "... are not born, and do not live, in isolation. Each is related to other claims, to the specification and drawings, to the prior art ... and often ... to earlier or later versions ..." *Kingsdown Medical Consultants v. Hollister Inc.*, 863 F.2d 867, 874 (Fed.Cir.1988) (en banc).

Plaintiff's counsel argued that "... when you look at ... uses, not individually, but collectively ... as a group, and you look at the uses that were described in the prior art, and you look at the similarities of structure, when you put all of that together, it is enough that the uses and the application were consistent with the uses of the earlier compounds." Closing Arguments, January 4, 1991 at 49.

Yet such uses and structures can hardly be evaluated by a patent examiner, the PTO or a court without awareness of such negative information as inconsistencies in the hormonal impact of the compound on differing animals.

ICI counsel went on to point out that "... a person reading the application would see" a reference to a possible use, "knowing of the uses of the other compounds, see that they are related and also see the relationships in the structure, and would understand ... what was implied ... the uses that were known...." Id. at 50. But neither a patent examiner nor a user reading specifications could make this analysis if crucial data, surprising and potentially contradictory, were left out. Here, ICI itself knew further research was required, and in fact performed it. ICI counsel

pointed out that you "get an idea, try it out and see if it works," Id. at 58. But neither the PTO nor a user would be sufficiently clued in as to what to try out and what to worry about without the withheld disclosures concerning mouse test results and their sharp divergence from rat testing results.

Counsel for ICI further emphasized quite appropriately that "... they couldn't predict with certainty what was going to happen until they made these compounds." Yet ICI picked and chose and in effect gerrymandered what portions of what happened it wished to reveal.

ICI counsel called attention to the fact that "... there is a degree of predictability in chemistry. But you can't predict absolutely," Id. at 59. But ICI knowingly withheld what it knew that would permit the PTO and users to predict as well as possible.

ICI counsel's insightful comments quoted above are in keeping with the more general reality recognized by the courts that the totality of crucial information forming a factual pattern is necessary to reach a proper conclusion. Circumstances pertinent to evaluation of any legal claim must be judged "without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962). Otherwise, risk of serious misjudgment can be created by erroneous "disaggregation" of the facts, see Tushnet, "Book Review," 82 Colum.L.Rev. 1531 (1982). To avoid this hazard, courts recognize that to reach a proper result, the "entire mosaic should be viewed rather than each tile separately." *Avis Rent–A–Car System v. Hertz Corp.*, 782 F.2d 381 (2d Cir.1966), quoting *FTC v. Sterling Drug, Inc.*, 317 F.2d 669, 674 (2d Cir.1963). This principle obviously applies to PTO evaluation of applications as much as to judicial evaluation of claims and defenses.

PTO Rule 56, 37 CFR 1.56 states that information "is material where there is a substantial likelihood that a reasonable ex-

aminer would consider it important in deciding whether to allow that application to issue as a patent." This applies not merely to the context in which the patent must be viewed as a whole, but in this instance to whether its usefulness—now, of course clear by hindsight—had been shown at the time of the application. If safe use was still uncertain until the contradictory animal tests were clarified, as ICI sought to do through further testing, an examiner might have concluded at that stage of development of the product that a showing of usefulness of the product was still premature. Whether this would have been the correct result is not the point. There is a "substantial likelihood" that a reasonable examiner would at least have considered the nondisclosures "important," particularly in the context of an *ex parte* presentation by the applicant. We do, in the patent application process, accept absence of deliberate knowing nondisclosure of obviously important information as a partial substitute for adversary argument, and as a major buttress of the presumption of validity of patents.

In its Closing Argument, January 4, 1991, at 192, ICI counsel attempts to overcome these difficulties by stating that "the trans-isomer of Tamoxifen" was involved in some tests, a fact necessarily important to a user or one basing further research on the invention disclosed in the patent. The court asked at that point:

"I thought we agreed ... that when we talked about Tamoxifen we're talking about a trans-isomer?" Id.

ICI counsel did not contradict this, but went on to say:

"The information that was available at that time, is that in the rat as in the human, this group of compounds were [sic] anti-estrogen. Whereas, this group of compounds in the mouse, [sic] were estrogens. In the human these compounds are anti-estrogen. In the rat, anti-estrogens and in the mouse, they are pure estrogens. And it would have on that ground ... be logical to discount this very limited information on mice." Id. at 192–93.

Far from suggesting that such "limited information" should be discounted, the risk that compounds covered by the patent application would be *estrogenic*—that is, functioning as did tamoxifen in *mice*, not as in humans or rats, is emphasized by the testimony at trial of ICI witness Dr. Alan Laird. He was under examination by ICI counsel at Tr. 1459–60 concerning incorrect assertions in his prior deposition:

"... on page 201 of the deposition I was asked whether Doctor Walpol [sic] ever told me that numerous compounds coming within the scope of these claims were highly estrogenic and said no, he did not.

"Again, I'm overlooking the fact that all the cisisomers are highly estrogenic.

"On page 352 ... I was asked whether anybody ever mentioned to me that different animal species react differently to Tamoxifen and I said 'Well, not before 1978.'

"What I think this question was directed to was whether I realized that Tamoxifen behaved differently in mice from rats. What I've realized subsequently is that in 1974, when I did a lot of work reorganizing these applications I did submit a paper by Harper and Walpol [sic] which included this mouse data. So it really can't be right of me to say I didn't know before 1978. When I put a paper in 1974 that has that data present in it, I'm afraid I was incorrect in that aspect."

Dr. Laird went on to concede in his direct examination on behalf of ICI that "Tamoxifen was variable, depending on the species ..." Id. 1460. This fact was obviously counterintuitive and surprising, as illustrated by Dr. Laird's failure to recall it during his deposition. It was not the sort of fact of which patent examiners or those skilled in the art would have been aware as a normal incident of products such as tamoxifen. It was a fact which was not brought to the PTO's attention by ICI's submissions, nor is it presently brought to the public's attention by the patent specifications.

Even now in this litigation and in the face of the obvious negative impact on its position of the facts Dr. Laird was required to disclose at trial, ICI has failed to come

forward with any logical explanation of the nature of the different impact of tomoxifen on mice on the one hand and on rats and humans on the other, that might explain why "Tamoxin was variable, depending on the species," which would be critical to the formulation of its best and safest uses. Concealing a mystery of this magnitude and importance from both the PTO and potential users or researchers clearly betrays rather than furthers the advancement of science, the very purpose of the constitutional Patent Clause as well as the Patent Code.

I have already noted that ICI itself did not discount the mouse test information, and instead conducted obviously important further research while having withheld the original information from the PTO upon a recommendation to withhold because it was not "helpful." The estrogen/anti-estrogen disparity between mice on the one hand, and rats and humans on the other, is precisely the kind of information which fairly cries out for further study by others as a result of disclosures of uses of the product in the patent. Without the withheld information, the disclosures made to the PTO, and through the patent to potential users or researchers, were fatally skewed.

We are taught that the "duty of candor extends throughout the patent's entire prosecution history. In determining inequitable conduct, a trial court may look beyond the final claims to their antecedents.... Therefore, a breach of the duty of candor early in the prosecution may render unenforceable all claims which eventually issue from the same or a related application." *Fox Industries v. Structural Preservation Systems*, 922 F.2d 801, 803–804 (Fed.Cir.1990).

By May 20, 1974 in PX 5 at p. 45–56 and in 1981 (PEX 5 at p. 355–73), ICI finally cited to the PTO, without discussion and buried in a list of references an article by Harper & Walpole, "A New Derivative of Triphenylethelyene: Effect on Implantation and Mode of Action in Rats," 13 J.Reprod.Fert. 101–19 (1967) (DEX 62), which referred to the mouse test results on the product. Absence of discussion of this far-from-highlighted item is more indicative of an intent to protect ICI's position than to call the matter to the attention of the PTO. The Harper & Walpole article was not cited in the patent specifications disclosed to the public.

The withholding by ICI of the mouse test results, and of information with respect to variability of the product in estrogen effects among species, was deliberate, knowing and fraudulent.

## V

The Patent Code (35 USC 112) requires a patent specification to "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains ... to make and use the same ..." It "shall set forth the best mode contemplated by the inventor of carrying out" the invention. The crucial requirements of Section 112 are that a patent make sufficient disclosure to permit a reader skilled in the art to practice it, a requirement known as "enablement," and to do so in the "best mode" contemplated by the inventor.

These requirements are part of the bargain under the Patent Clause of the Constitution as implemented by the Patent Code (35 USC) made between the public and the inventor seeking a patent. Pursuant to this bargain, crucial information must be provided. The bargain benefits both the public and the inventor: the public benefits by the advance of science and the useful arts; the inventor benefits by obtaining protection from infringement during the life of the patent.

The enablement requirement embraces the implicit subordinate mandate that "the specification teach those in the art to make and use the invention without 'undue experimentation.'" *In re Vaeck*, 947 F.2d 488, 495 (Fed.Cir.1991), quoting *In re Wands*, 858 F.2d 731, 737 (Fed.Cir.1988). Unpredictable future uses of an invention need not, however, be disclosed. 947 F.2d at 495–96 Nor need information be disclosed which is already well known in the

art. *In re Wands,* 858 F.2d 731, 735 (Fed. Cir.1988). Failure to report limitations on the appropriateness of certain uses, without further research as of the time of the disclosure, obviously defeats the completeness of the instruction.

■■■ A patent's public disclosures must also include the best mode of practicing the invention. *Wahl Instruments, Inc. v. Acvious, Inc.,* 950 F.2d 1575, 1579 (Fed.Cir. 1991) explains that the "purpose of the best mode requirement is to restrain inventors from applying for a patent while at the same time *concealing* from the public preferred embodiments of their inventions which they have in fact conceived." (emphasis in original). Where one skilled in the art "simply could not divine" the most advantageous way to use an invention, the best mode requirement is not met. *Chemcast Corp. v. Arco Industries,* 913 F.2d 923, 929 (Fed.Cir.1990).

■■ The enablement and best mode requirements are distinct from the requirement of disclosure to the PTO of information necessary to determine whether the invention is novel, nonobvious and useful, and thus patentable. But deliberate withholding of known relevant information is pertinent in both contexts. In "inequitable conduct" cases involving "violation of the statutory duty of disclosure," or "fraud on the Office," the material withheld must be material to the decision as to whether the patent should issue—i.e., is the invention novel, nonobvious and useful. Disclosure with respect to enablement and best mode must be material to the manufacture and use of the invention, and to the best mode of use. See *Modine Mfg. Co. v. Allen Group,* 917 F.2d 538 (Fed.Cir.1990); *Manville Sales Corp. v. Paramount Systems,* 917 F.2d 544 (Fed.Cir.1990).

■■ The deliberate, knowing and fraudulent withholding of the mouse data

adversely impacted upon the enablement and best mode instructions contained in the patent as issued. See *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.,* 863 F.2d 867 (Fed.Cir.1988).[3]

## VI

■■■ A patent is presumed valid once issued under 35 USC 282, placing the burden of persuasion on a party challenging it. To show invalidity, the challenger must do so by clear and convincing evidence. *American Hoist & Derrick Co. v. Sowa & Sons,* 725 F.2d 1350, 1358–59 (Fed.Cir. 1984), *cert. denied* 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1980). But a challenger not a party to a proceeding in which the validity of the patent was established must, of course, be heard and cannot be precluded from mounting a successful challenge if the burden of persuasion can be met.

In the present case, despite numerous factual disputes, the underlying information on the basis of which my factual findings have been predicated appear undisputed and they show clearly and convincingly that crucial information was deliberately withheld from the disclosures needed by the PTO to evaluate the application, and from information called for by 35 U.S.C. 112. The knowledge of the mouse test results, implementation of a recommendation not to disclose them in the Walpole Affidavit because they would not be helpful, and recognition thereafter by ICI of the need for further testing together with the absence of any effort to convey such knowledge to the PTO or to the public, establish the necessary knowledge and intent in each of these respects.

## VII

■■ The information which I have found crucial in determining that the patent is invalid does not relate to the purely affirmative descriptions of what one might

---

**3.** All of the data needed for Food and Drug Administration approval need not be available or disclosed in patent applications, nor in specifications meeting enablement and best mode disclosure requirements. See *In re Anthony,* 414 F.2d 1383, 1389 (C.C.P.A.1969). But enough information to caution users concerning how to

act to employ the product wisely is a necessary part of enablement or best mode. Where a risk may exist, at least a "starting point," *Cross v. Iizuka,* 753 F.2d 1040, 1051 (Fed.Cir.1985), informing the user how or where to check further, is necessary under the statute and vital to the public.

do with the patent, considered and ruled upon by the Federal Circuit. Rather, it relates to what was withheld from the PTO and from the public, which was not before the Federal Circuit in the prior litigation. Thus the Federal Circuit was not informed of tests performed by ICI on mice, and of the deliberate withholding of information concerning those tests from the PTO. I have not, therefore, considered myself bound by the outcome in that litigation.

## VIII

While Barr relies on numerous changes or omissions in ICI's affirmative descriptions of benefits which might be derived from tamoxifen, there is an absence of clear and convincing evidence that these, as opposed to the omission of the mouse testing information, were sufficiently clear to ICI to warrant requiring their assertion. Requirements for affirmative assertion of uncertain potential medicinal uses of pharmaceutical products must necessarily be tempered. Claiming debatable medicinal benefits in a public document such as a patent disclosure is necessarily risky. Erroneous or premature false hopes may lead to medical disasters in the United States or elsewhere for which the patentee might be blamed in the marketplace or sued in the courts of this or other countries. Moreover, the impact in the marketplace and on public perception of such hopes if raised but later dashed, suggests caution in making claims of this type mandatory in order to avoid invalidation of a patent.

Where disclosures can have undesirable side effects, the law is cautious in imposing them. Compare *United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). And here, ICI's definitive knowledge at the relevant points in time of the nondisclosed subsequent uses of the product is unclear.

Moreover, the adequacy of the affirmative aspects of disclosure of uses of the product, as distinct from suppression of relevant problematic information, was before the Federal Circuit at the time of its decision of February 15, 1985 overruling the then-made objections to the grant of the patent in suit. See PX 5. This is powerfully persuasive although not *res judicata* in view of Barr's non-involvement in that litigation.

And not all subordinate affirmative possible uses (as distinct from unmentioned hazards that might attend potential uses), nor all means of adding to the usefulness or efficiency of producing a patented product need be disclosed to the PTO or the public. See *Christianson v. Colt Industries Operating Corp.*, 822 F.2d 1544 (Fed. Cir.1987), *rev'd on other grounds* 486 U.S. 800, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988).

Thus, while the validity and enforceability of the patent in suit is rejected because of nondisclosure of the mouse test data both in submissions to the PTO and in the enablement and best mode specifications of the patent, Barr's defenses based on ICI's nonassertion of undisclosed potential positive uses of tamoxifen are rejected. Barr's other objections to enforcement of the patent in suit need not be reached.

## IX

While I recognize the probability that the Food and Drug Administration is already fully aware of all of the facts discussed here, in an excess of caution the parties are directed to submit copies of this opinion to it for its information, without thereby suggesting in any way that unresolved safety or efficacy problems exist or that further action by that agency is or is not appropriate.

Defense counsel will submit proposed judgment on notice.

## APPENDIX

### FINDINGS OF FACT

Because the underlying historical facts are virtually undisputed and the inferences to be drawn from them appear to follow with only the minimal uncertainty always present in all human affairs, I have found the following facts (as well as others set forth in the accompanying opinion) to be true by clear and convincing evidence:

1. Plaintiff Imperial Chemical Industries ("ICI"), a British corporation having its corporate offices and principal place of business in Imperial Chemical House, Millbank, London, England, holds U.S. Patent 4,536,516 (the "patent"), Plaintiff's Exhibit ("PEX") 200, issued August 20, 1985, covering the pharmaceutical compound known as Tamoxifen ("the product").

2. The patent was issued based in part on a series of prior submissions ("prior submissions") including among others submissions concerning the product to the Patent and Trademark Office ("PTO") in 1966 and thereafter.

3. Defendant Barr Laboratories, Inc. ("Barr"), a New York corporation having its corporate offices at 2 Quaker Road, Pomona, New York 10970, infringed the patent by filing an Abbreviated New Drug Application for the product and sending a notice on September 23, 1987 (PEX 229) notifying ICI that it contended the patent was invalid under 35 USC 271(e)(2).

4. ICI was aware that test results ("test results") of tamoxifen on mice showed estrogen effects opposite to the anti-estrogen effects found in tests on rats and desired in humans:

(a) when prior submissions were made to the PTO including an affidavit of Arthur Leonard Walpole (the "Walpole Affidavit") in June, 1966, defense exhibit ("DEX") 1, and

(b) when specifications of the patent were published (PEX 200). See DEX 37, 41, 62; Tr. 1450–60.

5. The test results on mice were not disclosed in the Walpole Affidavit in June, 1966. DEX 1 or other prior submissions; see Tr. 1450–60.

6. ICI was aware by 1974 that the estrogen effects of tamoxifen were variable, depending on the species. See Tr. 1450–60, especially at 1460.

7. Neither the test results nor that Tamoxifen was variable in its estrogen effects depending on the species were disclosed by ICI in. its specifications of the patent (PEX 200).

8. Without disclosing the test results on mice, or variability depending on the species mentioned in Finding 6, the patent (PEX 200):

(a) states that "... useful properties are in the field of the modification of the reproductive endocrine status in man and animals." PEX 200, p. 1, col. 2.

(b) mentions favorable test results concerning rats (p. 1, col. 2, p. 2, col. 3) but makes no disclosures of differing results in mice.

(c) refers to variants of the product as "conventional" without limitation to species affected (p. 1, col. 2).

9. Knowledge of the variability of the product in species would not be obvious to those skilled in the art. See Tr. 1450–60 (testimony of ICI expert witness Dr. Alan Laird).

10. No suggestion of the need for further research or limitation of use prior to further research was made by ICI in submissions to the PTO, including the Walpole Affidavit, or in the patent (PEX 200).

11. Responsible ICI authorities excluded the test results concerning mice and information concerning variability of the product between species from the Walpole Affidavit (DEX 1) because "the results with mice, which are incomplete and unhelpful, should be omitted," PEX 220, p. 572, quoted and discussed by Dr. Laird, Tr. 1450.

12. When ICI excluded from the patent specifications (PEX 200) the mouse test results and information concerning the variability of the effect of the product dependent on species, it did so deliberately and with knowledge of all facts mentioned above. See Tr. 1450–60.

13. ICI knew that the information excluded from the Walpole Affidavit and the patent as described above was material for the purposes of those documents and withheld the information fraudulently with intent to mislead and deceive. This finding is based on a combination of undisputed evidence, the demeanor and responses of ICI witnesses, absence of any other credible explanation for the omission of information

of this type suggested by ICI witnesses or argument, and the clear conclusion required by the totality of the evidence taken as a whole.

14. A user of the product skilled in the art or researcher skilled in the art:

(a) would not have known of the test results or variability of the product according to species at the time of the Walpole Affidavit submitted to the Patent Examiner.

(b) would not normally have known of such results or variability at the time of the publication of the patent, and would not have been given a starting point to look for such information by anything in the patent, although with sufficient diligence such information could have been found after 1967. See Tr. 3450–60.

(c) without further research or precautions might incur risks to human health if the product covered by the patent was used without knowledge of the omitted disclosures, because of ignorance of the possibility that variations in human biochemistry might cause variations in estrogenic effect of products covered by the patent as observed in differing animals but not disclosed.

(d) might incur risks if products covered by the patent were used in veterinary medicine, because no clue was provided concerning known variability in the hormonal effects of the products covered by the patent.

15. ICI omitted the information described above concerning the test results on mice and the variability of the estrogen effects of the product between species with fraudulent intent to mislead and deceive both the PTO, and readers and users of the patent and patented product concerning material matters, for the purposes of

(a) misleading the Patent Examiner in order to enhance the likelihood of issuance of the patent and accelerating such issuance without requirements for further research, and

(b) misleading potential users of the patented product or licensees under the patent by withholding negative information about its scope of use or risks of use, and about reasons for further research in connection with its use, thus increasing the value of the patent (PEX 200) and of exploitation of the invention under the patent.

16. A person seeking to practice the patent or conduct further research based on it, or to use it in the best mode would need the information withheld deliberately by ICI in the specifications of the patent (PEX 200), which was known to ICI as found above.

17. While fraudulent intent on the part of ICI has been found with respect to non-disclosures to the PTO and in the patent, ICI's conduct of this litigation has presented substantial issues, and moreover Barr has not attempted to show injury due to the existence of the patent which would justify relief beyond invalidation of the patent.

## CONCLUSIONS OF LAW

1. The abbreviations contained in the Findings of Fact above apply to these conclusions of law as well.

2. The parties, the patent, and the origins of this litigation are described in Findings of Fact 1–3.

3. U.S. Patent 4,536,516 (PEX 200) covering tamoxifen is invalid and is unenforceable by the plaintiff ICI because ICI deliberately, knowingly and fraudulently with purpose to deceive and mislead with respect to material matters:

(a) withheld from the PTO information material to its evaluation of the patent application, including prior continuation applications utilized in support of the patent, in particular in regard to results of tests relevant to the product in mice and to the variability of the estrogen effects of the product on species, which information would suggest possible risks and limitations on uses of the product, relevant to its usefulness as well as its place within the prior art relevant to novelty and nonobviousness

(b) withheld the same information in the specifications of the patent in the same regards, thus

(i) depriving readers of the patent of enablement to practice the patent, because any such practice without the withheld information might be hazardous unless limited or supported by further research at the time the patent was issued, and

(ii) depriving readers of the patent of the best mode of practicing the patent contemplated by the patentee, which knew that further research on the test results and variability mentioned above was essential to such best mode.

4. Both parties have conducted the litigation before this court in good faith.

5. The sole relief justified is a declaration that the patent is invalid.