### In re TAMOXIFEN CITRATE ANTITRUST LITIGATION
### No. MDL.NO. 1408 ILG.

United States District Court,
E.D. New York.

May 15, 2003.

See also 2003 WL 21196817.

Barbara J. Hart, Bernard Persky, Hollis L. Salzman, Goodkind, Labaton, Rudoff & Sucharow, LLP, New York City, Joel M. Cohen, Davis, Polk & Wardwell, New York City, Michael J. Flannery, The David Danis Law Firm, P.C., St. Louis, MO, for In Re Tamoxifen Citrate Antitrust Litigation.

## CORRECTED MEMORANDUM AND ORDER

GLASSER, District Judge.

### SUMMARY

Defendant AstraZeneca PLC appears specially to move to dismiss the claims against it for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. Plaintiffs allege that AstraZeneca PLC (by its purported predecessor in interest Zeneca Limited and with its subsidiaries and co-defendants Zeneca, Inc. and Astrazeneca Pharmaceuticals L.P.) entered into an agreement with co-defendant Barr Laboratories, Inc. ("Barr")[1] that monopolized and allocated the United States market for the drug tamoxifen citrate ("tamoxifen").

For the reasons stated below, AstraZeneca PLC's motion is denied.

### BACKGROUND

According to the Corrected Consolidated Class Action Complaint ("Complaint"), these actions involve the drug tamoxifen, the most essential drug for treatment of breast cancer. Breast cancer is the most common malignancy and is one of the leading causes of death among women. During the 1990's, more than 1.5 million women in the United States were newly diagnosed with breast cancer. Tamoxifen is a synthetic hormone developed in the 1970's that is used to treat both early and advanced-stage breast cancer and to prevent recurrence. Tamoxifen has become the most widely prescribed treatment for breast cancer, and indeed is the single most-prescribed drug in the world for any cancer. The World Health Organization lists tamoxifen as an "Essential Drug," and tamoxifen is the standard of comparison in most relevant clinical trials.

On August 20, 1985, Imperial Chemical Industries, PLC ("ICI") obtained United States Patent 4,536,516 (the '516 Patent) for tamoxifen. In December 1985 Barr filed an Abbreviated New Drug Application ("ANDA") with the Food and Drug Administration ("FDA"), requesting approval to sell a generic bioequivalent version of the pioneer drug tamoxifen.[2]

---

1. The co-defendants have moved separately to dismiss the action. Those motions are addressed by a separate Memorandum and Order.

2. An ANDA filer must certify why the patent would not be infringed pursuant to one of four reasons:
   I. No patent was in fact filed for the pioneer drug;
   II. The patent for the pioneer drug has expired;
   III. The patent for the pioneer drug will expire on a particular date *and* the ANDA filer will not market its generic product before that date; or
   IV. The patent for the pioneer drug is invalid or will not be infringed upon the *proposed generic product.*
   *See* 21 U.S.C. § 355(j)(2)(A)(vii)(I)-(IV). Upon the filing of an ANDA with a paragraph IV certification, the holder of the patent whose validity is being questioned may bring an action for declaratory judgment against the

Barr's ANDA application, as amended in September 1987, certified that the '516 Patent was invalid and unenforceable. ICI promptly sued Barr for patent infringement, which was tried before the late Honorable Vincent L. Broderick. On April 20, 1992, Judge Broderick held that the '516 Patent was invalid and unenforceable because ICI wrongfully withheld relevant material from the United States Patent and Trademark Office. *Imperial Chem. Industries, PLC v. Barr Labs., Inc.*, 795 F.Supp. 619 (S.D.N.Y.1992). ICI appealed that determination to the Federal Circuit.

In 1993, while the appeal was pending, Zeneca Limited (which had recently succeeded to ICI's rights in the '516 Patent) and Barr entered into a settlement agreement (the "Settlement Agreement"). Pursuant to the Settlement Agreement, Barr withdrew its challenge to the validity of the '516 Patent and amended its ANDA application to certify that it would not seek to market its generic version of tamoxifen until the patent expired. In return, Zeneca paid Barr $21 million and licensed Barr to sell tamoxifen manufactured by Zeneca in the United States, including Puerto Rico and the District of Columbia. The Settlement Agreement was conditioned upon the Federal Circuit vacating the Judgement declaring the '516 Patent invalid. The Settlement Agreement was executed by ICI, Zeneca Limited and Barr. On the same day, a Distribution and Supply Agreement was executed between Zeneca, Inc. and Barr.

On March 19, 1993 the Federal Circuit granted Barr and ICI's Joint Motion to Dismiss the Appeal as Moot and to Vacate the Judgment Below. On March 23, 1993 Judge Broderick vacated the judgement and entered a Stipulation of Dismissal and Order. Consequently, the '516 Patent remained valid, and Zeneca's brand and Barr's licensed version of tamoxifen were the only products on the market. Although Barr could produce tamoxifen at a lower cost than the price at which Zeneca licensed it, the price charged by Barr was restrained by that higher cost.

***Allegations Regarding AstraZeneca PLC***

AstraZeneca PLC is a British corporation based in the United Kingdom. (Compl.¶ 19.) With its subsidiaries, it is one of the largest pharmaceutical companies in the world. (*Id.*) The largest portion of its revenues come from sales in the United States. (*Id.*) American Depository Receipts of AstraZeneca PLC are traded on the New York Stock Exchange. (*Id.*) AstraZeneca PLC is alleged to control its subsidiaries and their directors, officers, employees and agents. (*Id.*) AstraZeneca PLC is also alleged to be the successor in interest to Zeneca Limited (a signatory to the Settlement Agreement). (*Id.*)

However, according to Adrian Charles Noel Kemp, Assistant Secretary of AstraZeneca PLC, its sole business is that of a parent holding company. (Kemp Aff., ¶ 4.) AstraZeneca PLC was created on April 6, 1999 by the merger of Zeneca Group PLC and Astra AB. (*Id.*, ¶ 2.) Kemp states that Zeneca Limited, a subsidiary of Zeneca Group PLC, was not a predecessor in interest to AstraZeneca PLC. (*Id.*, ¶ 3.) (However, he offers no explanation as to who succeeded to Zeneca Limited's interest after the Astra—Zeneca merger.) Kemp also states that subsidiaries like co-defendants Zeneca Inc. and AstraZeneca Pharmaceuticals L.P. do not hold the authority to act as agents for AstraZeneca PLC (*id.*, ¶ 4), that AstraZeneca PLC does not manufacture, design, advertise, market, package, sell, distribute,

ANDA filer. One of the benefits of being the first ANDA filer to obtain FDA approval is an exclusive 180–day period in which to sell the generic drug free from other generic drug competition. *See* 21 U.S.C. § 355(j)(5)(B)(iv).

or place into the stream of commerce any products, including tamoxifen, nor does it establish the prices for any products. (*Id.*, ¶ 5.) According to Kemp, AstraZeneca PLC is not authorized to, nor does it, do any business, keep any offices, engage in any service or solicitation with respect to any product, maintain distributors, wholesalers, or other representatives, rent or own property, have any employees, hold any bank accounts, have any telephone listing or pay taxes in the United States. (*Id.*, ¶ 6.)

In response to Kemp's affidavit, plaintiffs submit publicly available documents to refute these claims. These documents include:

- a Form F–4 filed by Zeneca Group PLC (AstraZeneca PLC's direct predecessor) with the Securities and Exchange Commission in 1995. (Hart Dec., Ex. 3.) In the F–4, Zeneca Group PLC designated Zeneca Inc. as its agent for service of process in the United States. (*Id.*, at 3.)

- the 1998 annual report from Zeneca Group PLC describing the structure of supervision by its board over the activities of its subsidiaries through a "Zeneca Executive Council" comprised of Executive Directors and Business Chief Executive Officers, the latter of which "are responsible for the management and performance of their respective businesses within the framework of Group policies .... supported by business audit committees ...."

(Hart Dec., Ex. 3, at 62.) The report states that Zeneca Group PLC's system of internal control "is designed to provide reasonable assurance of effective and efficient operations and compliance with laws and regulations," and then describes the various procedures used. (*Id.*, at 63.)

- AstraZeneca PLC's website (http://www.astrazeneca.com) which states that David Brennan (the President and CEO of US-subsidiary AstraZeneca Pharmaceuticals L.P.) is a member of AstraZeneca PLC's Senior Executive Team and "is in charge of all North American commercial operations." (*Id.*, Ex. 5, at 4–6.) [3]

- The website for AstraZeneca's U.S. operations (http://www/astrazeneca-us.com) also states that AstraZeneca PLC "is headquartered in London with its U.S. headquarters located in Wilmington, Delaware." (Hart Dec., Ex. 6.) [4]

- AstraZeneca PLC's 2001 annual report (located on its website) identifies the company's business strategy as follows: "We are committed to creating enduring shareholder value by delivering a flow of innovative medicines which meet the needs of patients and healthcare professionals in important areas of medicine. As a prescription pharmaceutical company focused on the introduction of new medicines, we are transforming our portfolio from successful but mature brands to a

**3.** The Declaration of Barbara J. Hart identifies Exhibit 5 as copies of selected pages from the AstraZeneca U.S. website (www.astrazeneca-us.com) and Exhibit 6 as copies of selected pages from the AstraZeneca PLC website (www.astrazeneca.com), but in fact those two exhibits are transposed in the copy provided, so that pages from the AstraZeneca PLC website are found at Exhibit 5 and pages from the AstraZeneca U.S. website are found at Exhibit 6. Since this merely appears to be

an error in assemblage of the exhibits, or at worst a scrivener's error in the declaration itself, this memorandum refers to the Exhibits as they were in fact assembled.

**4.** AstraZeneca's U.S. website also identifies David Brennan as both the President and CEO of AstraZeneca Pharmaceuticals L.P. and Executive Vice President of AstraZeneca PLC. (See http://www.astrazeneca-us.com/about/leadership.asp.)

21

range of exciting new products." (*Id.*, at 15 (AstraZeneca Annual Report and Form 20–F 2002, at 8).) According to the Annual Report, one of AstraZeneca PLC's six key priorities is to "Win in the US" (*Id.*, at 16.)

- AstraZeneca PLC's website also indicates that its "largest market is the US," (*id.*, at 25), and that AstraZeneca PLC maintains an investor relations office in Wilmington, Delaware. (*Id.*, at 57.)

It is undisputed for purposes of this motion that AstraZeneca PLC's subsidiaries were doing business at the relevant times in this district.

## *ANALYSIS*

▮▮▮ Plaintiffs bear the burden of establishing that the court has jurisdiction over the defendant. *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir.1994). However, when a motion to dismiss is brought before any discovery has been conducted, only a *prima facie* showing of personal jurisdiction is required to defeat the motion, *Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.1990), and plaintiffs may rely on the complaint, affidavits, and other supporting materials to satisfy their burden. *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir.1981). Such

pleadings and affidavits must be construed in the light most favorable to .the plaintiffs, and all doubts must be resolved in plaintiffs' favor. *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir. 1985).

## I. Personal Jurisdiction Under the Clayton Act

Section 12 of the Clayton Act provides: Any suit, action or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22.

This section thus provides both bases for venue and personal jurisdiction that supplement the general venue and service of process provisions in the United States Code and Federal Rules of Civil Procedure. Although the parties vigorously dispute whether venue under Section 12 must be satisfied before plaintiffs may avail themselves of its worldwide service of process, and courts in this Circuit are split over this issue,[5] this Court need not reach that issue.

**5.** In short, plaintiffs argue that if venue were satisfied under any of the statutes setting forth how to lay venue, then they may take advantage of the worldwide service of process provision in Section 12. The weight of the decisions are in accord. *See, e.g., In re Magnetic Audiotape Antitrust Litig.*, 171 F.Supp.2d 179, 184–85 (S.D.N.Y.2001), *vacated on other grounds sub nom., Texas Intern. Magnetics, Inc. v. BASF Aktiengesellschaft*, 31 Fed. Appx. 738 (2d Cir.2002) (summary order); *Daniel v. American Bd. of Emergency Medicine*, 988 F.Supp. 127, 198–200 (W.D.N.Y.1997); *Kingsepp v. Wesleyan Univ.*, 763 F.Supp. 22, 24 (S.D.N.Y.1991); *Grosser v. Commodity Exch., Inc.*, 639 F.Supp. 1293, 1313 (S.D.N.Y.1986), *aff'd*, 859 F.2d 148 (2d Cir.1988); *General*

*Elec. Co. v. Bucyrus–Erie Co.*, 550 F.Supp. 1037 (S.D.N.Y.1982); *cf. Go–Video, Inc. v. Akai Elec. Co., Ltd.*, 885 F.2d 1406, 1413–15 (9th Cir.1989). Under plaintiffs' theory worldwide service of process would be proper in this case, since venue against an alien defendant (such as AstraZeneca PLC) exists in any district. *See* 28 U.S.C. § 1391(d).

Defendants contend, however, that the two clauses must be read in tandem and therefore venue must be satisfied under Section 12 before plaintiffs may rely upon the worldwide service clause. *See, e.g., Yellow Pages Solutions, Inc. v. Bell Atlantic Yellow Pages Co.*, 2001 WL 1468168, at *3 (S.D.N.Y. Nov.14, 2001); *Michelson v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 709 F.Supp. 1279, 1286

The Supreme Court has construed the term "transacts business" to mean "the practical and broader business conception of engaging in any substantial business operations." *United States v. Scophony Corp.*, 333 U.S. 795, 807, 68 S.Ct. 855, 92 L.Ed. 1091 (1948). In so doing, the Court condemned a restrictive interpretation that overly relied upon the "artful arrangement of agents' authority, or of their comings and goings, or of the geography of minute incidents in contracting" if that would bar an aggrieved person from establishing venue locally. *Id.* at 808 n. 19, 68 S.Ct. 855.

When facing suit under the antitrust laws in that case, Scophony (a British company) argued that it "became concerned solely with creating and protecting an 'investment,' namely, in ... shares [of its American subsidiary]" and thus it was no longer transacting business after its subsidiary was formed. *Id.* at 812, 68 S.Ct. 855. However, the Court found that Scophony continued to transact business in the United States by virtue of the ongoing monitoring of the subsidiary:

> [I]n view of the agreements' continuing and pervasive effects .... they set the pattern for a regular and continuing program of patent exploitation requiring, as we have said, Scophony's constant supervision and intervention. That necessity was shown, among other ways, by the contractual provisions for interchange of data and information, and further by the fact that there was sustained interchange of correspondence between Levey [a director of Scophony and President and director of American Scophony] and Scophony devoted to Scophony's affairs and interests in this country. Levey kept Scophony informed fully of all that went on here, and in turn received and carried out its

instructions respecting American Scophony's affairs and its own.

*Id.* at 814–15, 68 S.Ct. 855. Based on these facts, the Court had little difficulty concluding that venue was proper because Scophony was transacting business in the United States.

As plaintiffs note, the facts in this case are almost impossible to distinguish from those in *Waldron v. British Petroleum Co.*, 149 F.Supp. 830, 832 (S.D.N.Y.1957). In *Waldron*, plaintiffs sought to establish venue pursuant to Section 12 over the Standard Oil Company of California ("Socal") in New York, where California Commercial Company and California Oil Company, two of Socal's wholly owned subsidiaries, were based and did business. *Id.* at 831. Although Socal did business in other states, with respect to operations in New York it was solely a holding company that "produce[d] and market[ed] petroleum products in various areas of this country and in foreign countries" through its subsidiaries. *Id.* In holding that Socal was transacting business within the Southern District of New York, the court noted:

> A person would have to be blind to the economic facts of business life if he did not recognize that the activities of Commercial and California Oil in this District are activities which in another less elaborate corporate set-up would be conducted directly by branch offices or agents within the District. It is Socal, and not the subsidiaries, which is the defendant in the present action. What is Socal? It is a large aggregation of invested capital which transacts its business through officers, agents, employees, and through subsidiaries, which in the drilling, production and marketing of oil operate as agents, employees or branch

(S.D.N.Y.1989); *cf. GTE New Media Services, Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351

(D.C.Cir.2000).

offices would operate. Does the fact that this large business entity, for tax reasons or otherwise, decides to fragmentize its operations into numerous corporate subsidiaries, make the resulting operations of the subsidiaries any the less a part of transaction of business by Socal?

\* \* \* \* \* \*

A corporation may be a fiction of the law but there is no reason to carry the fiction to the extreme of saying that a corporation which has wholly owned subsidiaries performing services in the local jurisdiction which ordinarily would be performed by service employees, or making sales which ordinarily would be made by a sales department, is in fact not transacting business in that jurisdiction, particularly when the entire corporate set-up of the defendant shows that it is designed to operate to a substantial degree through separate corporate entities responding to the wishes and directions of the parent and providing the revenues sought by the parent. We would be exalting fiction over fact if we were to conclude that under those circumstances the parent company was not in fact transacting business in this District through the instrumentality of its wholly owned subsidiaries.

*Id.* at 834–35.

■ Given *Scophony*'s understanding that transacting business consists of the "practical and broader business conception of engaging in any substantial business operations," 333 U.S. at 807, 68 S.Ct. 855, plaintiffs here have sufficiently alleged facts to sustain personal jurisdiction over AstraZeneca PLC under Section 12 of the Clayton Act. First, plaintiffs allege that AstraZeneca PLC succeeded to Zeneca

Limited's interests in the Settlement Agreement. Although AstraZeneca PLC denies that it was the successor in interest (Kemp Dec. ¶ 3), other statements in that declaration are contradicted by AstraZeneca PLC's own marketing material. *Compare* Kemp Dec. ¶ 6 (stating that AstraZeneca PLC keeps no offices in the United States) *with* Holt Dec., Ex. 5, at 57 (listing a Wilmington, Delaware address for AstraZeneca PLC's Investor Relations office) *and* Ex. 6, at 2 ("AstraZeneca PLC is headquartered in London with its U.S. headquarters located in Wilmington, Delaware").[6] At the very least, plaintiffs' allegations that AstraZeneca PLC succeeded in interest to Zeneca Limited's role in the Settlement Agreement have set forth a prima facie case on successor liability.

Second, much like the holding company in *Waldron*, the activities taken by AstraZeneca PLC's subsidiaries here are those that AstraZeneca PLC would have to undertake directly if the subsidiary did not exist to perform them. *Cf. Bulova Watch Co. v. K. Hattori & Co.*, 508 F.Supp. 1322, 1344 (E.D.N.Y.1981) (personal jurisdiction existed over Japanese parent under New York long-arm statute where evidence established that "subsidiaries do for the parent everything that the parent would have to do if it were here directly"). Taken as a whole, the complaint and exhibits suffice to set forth a prima facie case that if no American subsidiary existed, AstraZeneca PLC would need to act directly in order to achieve its goals marketing pharmaceuticals in the United States.

In its reply memorandum, AstraZeneca PLC contends that it is simply a holding company and that therefore its subsidiaries are not performing any activity that it

**6.** Similarly, although Kemp states that AstraZeneca PLC has no employees in the United States, the President and CEO of Astrazeneca Pharmaceuticals L.P. (the primary marketing subsidiary of AstraZeneca PLC in the United States) is also an Executive Vice President of AstraZeneca PLC.

would undertake itself. (Reply Mem. at 20–21.) However, given the self-proclaimed focus of AstraZeneca PLC on the research, development, marketing and sales of pharmaceuticals as evidenced by its website and annual report and the emphasis on success in the United States marketplace, this argument is not persuasive once all inferences are drawn in favor of plaintiff.

## II. The Due Process Clause

■ In addition to the prior discussion, however, a court must examine whether the defendant has "certain minimum contacts ... such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Calder v. Jones*, 465 U.S. 783, 788, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). Because the claims are based upon federal question jurisdiction, the Court must analyze AstraZeneca PLC's contacts with the United States as a whole. *Chew v. Dietrich*, 143 F.3d 24, 28 n. 4 (2d Cir.1998).

As noted above, plaintiffs allege that AstraZeneca PLC succeeded in interest to the signatory of the Settlement Agreement which settled an appeal of a judgment entered by a federal district court in New York. Moreover, AstraZeneca PLC maintains an Investors Relations Office in Wilmington, Delaware (where it claims that its "US Headquarters" also is located), and its Executive Vice President for North American operations is the President and CEO of one of its American subsidiaries. Based on the current state of the record, AstraZeneca PLC has sufficient minimum contacts with the United States to satisfy due process.

■ In addition to minimum contacts, however, a court must determine whether the assertion of personal jurisdiction "comports with traditional notions of 'fair play and substantial justice'—that is, whether it is reasonable under the circumstances of a particular case." *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 568 (2d Cir.1996) (quoting *International Shoe v. State of Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). "Whether it is reasonable to exercise jurisdiction in a particular case depends on (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.*, 241 F.3d 135, 152 (internal quotations omitted).

In the present case, the factors weigh in favor of finding the exercise of personal jurisdiction reasonable. Given that AstraZeneca PLC maintains an office in the United States, is alleged to have succeeded in interest to the signatory of the Settlement Agreement, and openly claims to seek the advantages of the United States market, the burden of defending this action simply is not so overwhelming that it would otherwise be unreasonable or fail to comport with traditional notions of fair play and substantial justice.

Finally, although it probably need not be said, the Court is well aware of the point made repeatedly throughout AstraZeneca PLC's briefs (Def. Mem. at 15–16; Def. Reply Mem. at 3–6, 13–14) that a higher showing is necessary to sweep aside the corporate veil between it and its subsidiaries. *See, e.g., United States v. Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) (noting that "owner or operator" test for substantive liability under CERCLA did not abolish traditional notion of corporate separateness between parent and subsidiary). Whether the *liability* of

AstraZeneca PLC's subsidiaries may be imputed to it, however, is not the issue before this Court. *See Bulova*, 508 F.Supp. at 1342. Rather, the question presented by this motion is whether AstraZeneca PLC might be amenable to suit, *id.*, and that question, once all inferences are resolved in favor of plaintiffs as they must under Rule 12(b)(2), must be answered in the affirmative.

## CONCLUSION

For the foregoing reasons, the motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) is denied.

SO ORDERED.