**In re NEW MOTOR VEHICLES CANADIAN EXPORT ANTITRUST LITIGATION**

No. MDL 1532.

United States District Court,
D. Maine.

March 4, 2004.

Robert S. Frank, Harvey & Frank, Portland, ME, for Plaintiffs.

William J. Kayatta, Jr., Pierce Atwood, Portland, ME, for Defendants.

## MEMORANDUM DECISION AND ORDER ON DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

HORNBY, District Judge.

In this opinion I conclude that section 12 of the Clayton Act permits worldwide service of process upon alien corporate defendants in antitrust cases, and that the Fifth Amendment measures the constitutional adequacy of contacts by such defendants according to their contacts with the United States as a whole.

### I. SUMMARY

New motor vehicle purchasers and lessees claim that American and Canadian car manufacturers, distributors, dealers (although not named as defendants) and dealer associations conspired to prevent a discount distribution channel from operating in the United States—specifically, that cheaper Canadian versions of various models were prohibited entry into the American market. They maintain that the conspiracy violated section 1 of the Sherman Act, 15 U.S.C. § 1 (1997), and that the resulting lack of competition kept American retail prices excessively high. They seek class-wide damages [1] and injunctive relief under sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26 (1997). The Multi–District Panel has transferred 26 such cases to this District for pretrial management. Parallel cases are pending in a number of state courts.

Certain Canadian defendants—Toyota Canada, Inc. ("Toyota Canada"); Daimler-Chrysler Canada, Inc. ("Daimler Canada"); Mercedes–Benz Canada, Inc. ("Mercedes–Benz Canada"); Nissan Canada, Inc. ("Nissan Canada"); BMW Canada, Inc. ("BMW Canada"); and the Canadian Automobile Dealers Association ("CADA")—move to dismiss for lack of personal jurisdiction under Fed.R.Civ.P. 12(b)(2).

After oral argument on January 5, 2004, it is my understanding that (1) the plaintiffs' Amended Consolidated Class Action Complaint supercedes *all* previous complaints in these consolidated actions; (2)

---

1. The request for class certification is not yet ripe.

no defendants now seek dismissal for improper service of process; (3) the plaintiffs do not assert jurisdiction based on any state long-arm statute; and (4) the plaintiffs do not attempt to meet the First Circuit's requirement for asserting personal jurisdiction under Fed.R.Civ.P. 4(k)(2). *See United States v. Swiss Am. Bank, Ltd.,* 191 F.3d 30, 41–42 (1st Cir.1999).

I **DENY** the 12(b)(2) motions of Daimler Canada and CADA. I **GRANT** the 12(b)(2) motions of Nissan Canada, BMW Canada and Toyota Canada. I **DEFER** action on the motion of Mercedes–Benz Canada, while permitting jurisdictional discovery concerning Mercedes–Benz non-export arrangements.

## II. ANALYSIS

### (A) Section 12 of the Clayton Act

Section 12 of the Clayton Act provides: Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22 (1997).

The cases are unanimous that this single sentence has two topics. The clause before the semi-colon is a venue provision (describing districts where an antitrust lawsuit against a corporate defendant may be heard). *See United States v. Scophony Corp.,* 333 U.S. 795, 802, 68 S.Ct. 855, 92 L.Ed. 1091 (1948); *GTE New Media Services v. BellSouth Corp.,* 199 F.3d 1343, 1350 (D.C.Cir.2000); *In re Auto. Refinishing Paint Antitrust Litig.,* 358 F.3d 288, 293 (3d Cir.2004). The clause following

the semi-colon is a jurisdiction/service of process provision (describing where a corporate defendant may be served with papers that bring it before a particular court). *See id.* The cases also agree that the second clause's final phrase, "wherever it may be found," permits worldwide service of process upon a corporate defendant if that corporate defendant is subject to section 12's language. *See Go–Video, Inc. v. Akai Elec. Co., Ltd.,* 885 F.2d 1406, 1413 (9th Cir.1989); *Auto. Refinishing Paint,* at 293; *Amtrol. Inc. v. Vent–Rite Valve Corp.,* 646 F.Supp. 1168, 1171 (D.Mass. 1986).

But courts have struggled for years with the meaning of the second clause's limiting phrase "in such cases."[2] Does "such cases" mean antitrust lawsuits against a corporate defendant? Or does it mean only antitrust cases against a corporate defendant that meet all the criteria of the first clause, *i.e.,* where venue is established on the criteria set out there? The question is important because there is a separate venue statute that is broader for alien defendants, permitting venue over alien defendants in any district. *See* 28 U.S.C. § 1391(d). If plaintiffs can use the alien venue statute in combination with section 12's service of process provision, they can sue an alien corporate defendant in federal court anywhere in the United States, subject to constitutional limitations, and serve that defendant anywhere in the world. But if section 12's worldwide service provisions are limited to cases where venue exists under section 12's first clause, plaintiffs will be far more limited in their choice of forum.

▆ The parties agree that in this multi-district case I must apply First Circuit law to determine the answer. Unfortu-

---

**2.** *See, e.g., Auto. Refinishing Paint,* at 293; *GTE,* 199 F.3d at 1351; *Go–Video,* 885 F.2d at 1408; *Goldlawr, Inc. v. Heiman,* 288 F.2d 579, 581 (2d Cir.1961); *General Elec. Co. v. Bucyrus–Erie Co.,* 550 F.Supp. 1037, 1041–42 (S.D.N.Y.1982).

nately, the First Circuit has not spoken on the issue. Until last month, there was an even split of the other Circuits, the Ninth Circuit choosing the first (broader) interpretation and the D.C. Circuit choosing the second (narrower).[3] *Compare Go–Video,* 885 F.2d at 1413 *with GTE,* 199 F.3d at 1351. Part of the delay in issuing this opinion reflected my own effort to write an opinion dealing with the ambiguous language of the statute, the circuit and district cases, the legislative history, and Supreme Court pronouncements about venue generally and about the section 12 language in particular. But now the Third Circuit has written a comprehensive opinion surveying the authorities, *In re Auto. Refinishing Paint Antitrust Litig.,* 358 F.3d 288. I see no reason as a trial court judge to repeat what it has done. Its reasoning is persuasive. I believe the First Circuit will follow it, if presented with the issue. I therefore follow the Third Circuit (and the Ninth Circuit), concluding that the second, worldwide service, clause of section 12 is available in antitrust cases generally against corporate defendants, and that a plaintiff can use it in conjunction with the alien venue statute.

### (B) Nationwide Contacts

▇ Finding that the statutes permit personal jurisdiction is the first step in the analysis. But there is a second step: the exercise of jurisdiction must also meet constitutional requirements. Because the personal jurisdiction asserted here derives from federal statutes, I do not apply the traditional Fourteenth Amendment due process analysis that deals with the power of the individual states. Instead, the constitutional inquiry arises under the Fifth Amendment (dealing with the federal government) and the analysis is whether a particular defendant has sufficient contacts with the United States as a whole to justify the assertion of federal court jurisdiction over it. The Supreme Court has not spoken to this issue, but that is the teaching of First Circuit caselaw. In *United States v. Swiss Am. Bank, Ltd.,* 274 F.3d 610, 618 (1st Cir.2001), the court stated:

> The personal jurisdiction inquiry in federal question cases like this one differs from the inquiry in diversity cases. Here, "the constitutional limits of the court's personal jurisdiction are fixed ... not by the fourteenth Amendment but by the Due Process Clause of the Fifth Amendment." This distinction matters because under the Fifth Amendment, a plaintiff need only show that the defendant has adequate contacts with the United States as a whole, rather than with a particular state.

(internal citations omitted); *accord United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1085 (1st Cir.1992). Here, the plaintiffs assert both general and specific jurisdiction. I analyze the showing they have made under the *prima facie* standard of *Boit v. Gar–Tec Products, Inc.,* 967 F.2d 671, 675 (1st Cir.1992). Thus I "consider only whether the plaintiff has proffered evidence that, if credited, is enough to support findings of all facts essential to personal jurisdiction." *Id.* I consider both "general" jurisdiction (jurisdiction asserted in connection with

---

**3.** It is unclear how the Second Circuit currently views section 12 of the Clayton Act. *Compare Goldlawr,* 288 F.2d at 581 ("[I]f a corporation is not an inhabitant of, is not found in, and does not transact business in, the district, suit may not be so brought.... [T]he extraterritorial service privilege is given only when the other requirements are satis-fied."), *with Leasco Data Processing Equip. Corp. v. Maxwell,* 468 F.2d 1326, 1341 n. 10 (2d Cir.1972) (liberally construing the same phrase in the Securities Exchange Act as referring only to service of process and having nothing to do with venue, and noting that the "ineptly worded provision" was modeled after section 12 of the Clayton Act).

suits not directly founded on forum-based conduct) and "specific" jurisdiction (jurisdiction asserted when a suit arises directly out of forum-based activities). *See Donatelli v. National Hockey League*, 893 F.2d 459, 462–63 (1st Cir.1990) (citations omitted). Because there is no Supreme Court caselaw on the Fifth Amendment issue, I use the factors identified in its Fourteenth Amendment jurisdictional cases, as they apply to nationwide contacts.

### (1) General Jurisdiction

■ Assertion of general jurisdiction over a defendant requires a court to examine a defendant's contacts with the forum "to determine whether they constitute the kind of continuous and systematic general business contacts" that will satisfy constitutional standards. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). If sufficient contacts do exist, the exercise of jurisdiction must also be reasonable. *Swiss Am. Bank*, 274 F.3d at 619 (citing *Donatelli*, 893 F.2d at 465). But if such contacts do not exist in sufficient abundance, the general jurisdiction inquiry ends. *Donatelli*, 893 F.2d at 465. The constitutional parameters of general jurisdiction require the contacts to be "continuous" and "substantial" (single or isolated activities are insufficient), and at a level "that a party who enjoys the benefits of conducting business in a particular forum should be willing to bear the correlative burden of submitting to the forum's courts." *Id.* at 463 (citing *Int'l Shoe Co. v. State of Washington*, 326 U.S. 310, 317–19, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). The Supreme Court has said that these principles are designed to permit people or entities to structure their conduct in such a manner as to gain some assurance that their conduct will not render them liable to suit in a particular jurisdiction. *See Burger King v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (cit-

ing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)).

In this case, the plaintiffs allege general factors in support of general jurisdiction: the defendants benefited from international agreements designed for the automotive industry such as NAFTA and Auto Pact; substantial automotive trade goes on between the United States and Canada; and complex corporate structures camouflage the reality of United States trade. Pls.' Mem. in Opp'n at 3–7 (Docket Item # 74). These contextual allegations are insufficient to support general personal jurisdiction. A particular defendant *itself* must create the connection with the forum. *See Asahi Metal Indus. Co., Ltd. v. Superior Ct. of California, Solano County*, 480 U.S. 102, 109, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (citing *Burger King*, 471 U.S. at 475, 105 S.Ct. 2174).

The plaintiffs also point to various defendant activities as continuous and systematic contacts with the United States sufficient to support general jurisdiction: using United States-based advertising services; officers attending meetings and training in the United States; purchasing parts and vehicles from the United States; manufacturing and selling vehicles in Canada that ultimately end up in the United States market; and being party to American lawsuits. Pls.' Mem. in Opp'n at 7–13. I conclude that separately and collectively these factors and activities do not meet the constitutional threshold for general jurisdiction over the Canadian defendants.

First, taking advantage of American advertising services, attending general meetings in the United States or purchasing vehicle parts from the United States unrelated to the underlying cause of action, without more, will not support general jurisdiction. *See, e.g., Helicopteros*, 466 U.S. at 416, 418, 104 S.Ct. 1868 (purchases of

helicopters, equipment and training services, even if occurring at regular intervals, accepting into a bank account checks drawn on a bank located in the forum and sending personnel and officers to the forum for training and contract negotiation sessions are not sufficient to warrant personal jurisdiction over a nonresident defendant corporation in a cause of action not related to those activities); *Swiss Am. Bank*, 274 F.3d at 619–20 (citing *United States v. Swiss Am. Bank, Ltd.*, 116 F.Supp.2d 217, 221–22 (D.Mass.2000)) (foreign bank's advertising in an American magazine, subscribing to an American credit card company, entering into a licensing agreement with an American company, being an appellant to a lawsuit in an American court, having relationships and accounts with American banks and entering into contracts, joint ventures and loan agreements with American companies are insufficient contacts to meet the standards of general jurisdiction); *Noonan v. Winston Co.*, 135 F.3d 85, 92–93 (1st Cir.1998) (general jurisdiction did not exist where foreign company solicited business in the forum, and visited the forum to establish business relationships and negotiate orders); *Cascade Steel Rolling Mills v. C. Itoh & Co.*, 499 F.Supp. 829, 841 (D.Or. 1980) (denying jurisdiction over Japanese steel company whose employees made isolated visits to the U.S. on matters unrelated to the antitrust claim); *accord* Philip E. Areeda & Hebert Hovenkamp, IA *Antitrust Law* ¶ 271c, c2, at 340, 342 (2d ed.2000) (citations omitted) (a few meetings, isolated visits, attendance at trade association meetings (at least when not related to the litigation's subject matter), sponsorship of national advertising, and purchase of American parts by a foreign corporation are insufficient contacts for personal jurisdiction).

Second, the manufacturing of vehicles in Canada destined for eventual distribution in the United States (through intermediate sales) does not add enough to sustain general jurisdiction: the defendants' manufacturing operations are not within the forum.

Finally, being a party to an American lawsuit unrelated to this lawsuit cannot be considered a continuous or systematic activity. *See Donatelli*, 893 F.2d at 463 (citations omitted) (single isolated activities insufficient); *Swiss Am. Bank*, 274 F.3d at 619 (even in combination with other contacts, being an appellant in a lawsuit in an American court insufficient to assert jurisdiction).

Because all the Canadian defendants lack the continuous and substantial contacts with the forum necessary to assert general jurisdiction, I turn to specific jurisdiction.

### (2) *Specific Jurisdiction*

■ In order to sustain specific jurisdiction over these Canadian defendants, the plaintiffs must show first that (1) the defendants in question purposefully directed activities towards residents of the forum (here, the United States as a whole), and (2) the litigation results from injuries that arise out of or relate to those activities. *Burger King Corp.*, 471 U.S. at 472, 105 S.Ct. 2174 (internal quotations and citations omitted) (14th amendment case). Second, these contacts must constitute "purposeful availment" of the benefits and protections afforded by the forum's laws. *Swiss Am. Bank*, 274 F.3d at 621. The cornerstones of purposeful availment are voluntariness and foreseeability of being haled into the forum's courts. *Sawtelle v. Farrell*, 70 F.3d 1381, 1391 (1st Cir.1995) (citing *Ticketmaster–New York v. Alioto*, 26 F.3d 201, 207 (1st Cir.1994)). *See also Burger King*, 471 U.S. at 475, 105 S.Ct. 2174 (jurisdiction may not rest on the "unilateral activity of another party or third person"); *World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. 559 (for a court to

assert jurisdiction, a defendant's conduct and connection with the forum must be such that it should reasonably anticipate being haled into court there).

Third, even where such contacts exist, I must examine reasonableness. I must consider: (1) the defendant's burden of appearing; (2) the forum's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies. *See Asahi,* 480 U.S. at 113–116, 107 S.Ct. 1026 (citing *World–Wide Volkswagen,* 444 U.S. at 292, 100 S.Ct. 559). In addition, special concerns arise when dealing with foreign defendants who may face unique and serious burdens litigating in a foreign legal system. *Id.* at 113–116, 107 S.Ct. 1026.

### (a) CADA

The Canadian Automobile Dealers Association ("CADA") is a not-for-profit organization that represents, promotes and protects the interests of franchised automobile dealers in Canada. Gauthier Decl. ¶¶ 1–4 (Docket Item # 67). CADA does not sell or lease vehicles in the United States or Canada. *Id.* ¶ 7. The consumers allege that CADA issued an August 2002 report that describes a meeting with NADA where a "multi-faceted strategy was discussed" and "a consensus to work together" was reached to prevent new motor vehicle exports from Canada to the United States. Amended Compl. ¶ 68. The consumers assert that this CADA report claims that American and Canadian deal-

ers and NADA "will cooperate wherever possible in assisting CADA with initiatives addressing export sales," and that representatives of the manufacturing defendants are pursuing "a united campaign against the unauthorized exporting of new vehicles into the U.S.A." *Id.* ¶¶ 69, 71. Thus, the plaintiffs maintain that in its representative role, CADA supported certain activities and strategies designed to limit American consumers' ability to purchase or lease exported Canadian motor vehicles.[4] *See* Maier Aff., Exs. 10, 11; Gauthier Decl. ¶ 6.

The specific contact with the forum is CADA's attendance at a New York meeting in March 2002. CADA met with the National Automobile Dealers Association ("NADA") (representing American dealers) in New York on that date to discuss the "[e]xport sales issue," which it called "an issue of great concern to both associations." Maier Aff., Ex. 10 at 2; Gauthier Decl. ¶ 6. CADA documented its attendance and the topic of the meeting in both a newsletter and memorandum.[5] Maier Aff., Exs. 10, 11. CADA made this contact voluntarily and deliberately, not through a third party. CADA "deliberately 'reach[ed] out beyond' [Canada] and negotiated with [an American] corporation ...." *Burger King,* 471 U.S. at 479, 105 S.Ct. 2174. Although it was a single meeting in the United States on this topic, the plaintiffs allege that CADA participated in the conspiracy to withhold Canadian vehicles from the American market through precisely this type of informational meeting, *see* Amended Compl. ¶ 5, and that at this New York meeting CADA "made it clear to the NADA representatives that

---

4. The industry refers to these export sales as "Grey Market Sales." *See* Maier Aff., Ex. 10 (Docket Item # 75).

5. On January 16, 2002, a CADA representative also attended a meeting with the Resource Dealers Group in Chicago regarding

Canadian automobile warranties. Gauthier Decl. ¶ 6. The plaintiffs, however, have not proffered any evidence that the meeting's topic was grey market warranties in general or, specifically, the refusal to honor Canadian warranties in the United States.

CADA would in no way support known exporters .... " Maier Aff., CADA Newsletter, Ex. 10 at 2. Accepting this evidence as true solely for the purposes of jurisdictional analysis, one can infer CADA's statement to be an *agreement* made in New York to help withhold Canadian vehicles from the American market. That is sufficient to make a *prima facie* showing of personal jurisdiction. This was significant activity in the United States that related to this litigation. This litigation results from alleged injuries that "arise out of or relate to" this activity. "[P]arties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' " are subject to jurisdiction. *See Burger King,* 471 U.S. at 473, 105 S.Ct. 2174. Under *Burger King,* when contact with the forum is related to the cause of action, as here, jurisdiction is more readily granted. Areeda & Hovenkamp, IA *Antitrust Law* ¶ 271c, at 340 (citing *Burger King* ).

In assessing the reasonableness factors (called the gestalt factors in the First Circuit, *Sawtelle,* 70 F.3d at 1394), I conclude that the extent of the burden on CADA to litigate in the United States falls short of reaching constitutional significance. Although defending in a foreign jurisdiction always presents some measure of inconvenience, *accord id.* at 1395 (citing *Pritzker v. Yari,* 42 F.3d 53, 64 (1st Cir.1994)), CADA regularly participates in meetings, conventions and symposiums in the United States. *See* Gauthier Decl. ¶ 6. American courts clearly have an interest in adjudicating the antitrust injury that the plaintiffs allege, and the plaintiffs should be afforded deference in choosing to press

their claims in American courts, *see Sawtelle,* 70 F.3d at 1395 (citations omitted). The United States has attempted to provide a convenient forum for its residents to redress injuries of the foreign defendants. The Multi–District Panel chose to transfer these cases to Maine because I have the time and experience to oversee this litigation, and because Maine is a convenient forum due to its proximity to Canada. Transfer Order at 2 (Docket Item # 1). The interest of the judicial system in the effective administration of justice does not appear to cut in either direction here. *See Ticketmaster–New York,* 26 F.3d at 211. One substantive social policy to consider, *see Asahi,* 480 U.S. at 115, 107 S.Ct. 1026, might be the appropriateness of application of American antitrust laws to foreign corporations, but that issue has not been raised by the parties in discussion of the jurisdictional calculus.

After considering the relatedness of CADA's activities for the underlying claim, the deliberateness of its conduct and the reasonableness of the exercise of jurisdiction, I DENY CADA's motion to dismiss for lack of personal jurisdiction.

### (b) Canadian Manufacturers/Distributors

■■■ The manufacture, distribution and sale of a particular brand of motor vehicles on a worldwide basis typically involve many corporate entities. The plaintiffs assert that the enterprise is nevertheless integrated in each brand and that a court should not be diverted in the personal jurisdiction analysis by limiting itself to the contacts of a singular corporate defendant.[6] They point to websites where vari-

---

6. Despite the economic realities, I do not treat the corporate activities of the intricate corporate structures present in this case as unified action by parents and subsidiaries. I also do not uphold general jurisdiction on this basis over any Canadian defendant, each of them a corporate subsidiary, because a sub-

sidiary does not achieve continuous and systematic contacts with the United States solely by having a parent company located in the United States. *See Saraceno v. S.C. Johnson and Son, Inc.,* 83 F.R.D. 65, 67 (S.D.N.Y. 1979) (citing *Cannon Mfg. Co. v. Cudahy Packing Co.,* 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed.

ous defendants boast of the worldwide nature of their operations and the integration of their activities.[7]

▮▮▮ The plaintiffs also assert that at least some of these Canadian defendants have purposefully engaged in a two-channel distribution system by which vehicles they manufacture flow into the United States, through their parent or related companies, at higher prices; while the same vehicles, distributed in Canada at lower prices, are forbidden export to the United States.[8] (This is the lost discount distribution channel that is the basis of the plaintiffs' antitrust complaint.) This activity (sending higher priced vehicles while withholding lower priced vehicles), they say, is "purposefully directed" at American consumers, and their lawsuit "arises out of or relates to" these arrangements. *See Burger King*, 471 U.S. at 472–73, 105 S.Ct. 2174 (internal citations omitted). The defendants, on the other hand, argue that in a constitutional analysis a court should

634 (1925)); *Henry v. Offshore Drilling (W.A.) Pty., Ltd.*, 331 F.Supp. 340, 342 (E.D.La. 1971). However, I am troubled by the fact that the corporate websites of these automobile manufacturers and distributors go out of their way to describe the global nature and interconnectedness of the various subsidiaries, *see* n. 7, *infra*. Unwittingly, they make a strong case for the recent conclusions by some commentators and courts, that continuing to observe the corporate forms for personal jurisdiction purposes is blinking today's economic reality. *See, e.g., In re Tamoxifen Citrate Antitrust Litig.*, 262 F.Supp.2d 17, 22–23 (E.D.N.Y.2003) (citing *Waldron v. British Petroleum Co.*, 149 F.Supp. 830, 834–35 (S.D.N.Y.1957)); Lea Brilmayer and Kathleen Paisley, *Personal Jurisdiction and Substantive Legal Relations: Corporations, Conspiracies, and Agency*, 74 Calif. L.Rev. 1, 6 (1986) (stating that courts are giving approving attention to the argument that substantive legal relationships with a party may be automatically sufficient to establish jurisdiction). *See also Scophony*, 333 U.S. at 808, 68 S.Ct. 855 (stating that "practical, business conceptions" should be substituted for "hair-splitting legal technicalities"). The First Circuit's parsimonious view of parent-subsidiary relationships, *see, e.g., United Elec.*, 960 F.2d at 1092–93 (requiring proof of lack of corporate independence, fraudulent intent and manifest injustice before the corporate unit will be ignored), may be ripe for re-examination, particularly in light of the expansive statements these defendants make about North American and global operations, which may indicate they should have fair notice of suit in the United States. Recognizing the close relationship between parents and their subsidiaries (especially in this case) for jurisdictional purposes would also be consistent with the liability rule that, due to a complete unity of interest, the coordinated activity of a parent and its wholly owned subsidiary cannot be considered a conspiracy and must be viewed as that of a single enterprise. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771–72, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984).

7. *See, e.g.*, Maier Aff., Ex. 3 (website calling DaimlerChrysler AG "a new global transportation enterprise" and noting that DaimlerChrysler's Canadian production facilities build vehicles for the Canadian and United States markets), Ex. 7 (website noting that Toyota Motor Manufacturing Canada exports to the United States and Mexico), Ex. 8 (website stating that the "many sides" of Nissan are reflected in "13 distinct affiliates in North America"), Ex. 19 (website indicating that DaimlerChrysler is "a truly global company" with a "global workforce, a global shareholder base, globally known brands, and a global outlook") and Ex. 20 (website stating that Daimler Canada makes "large-scale shipments to the United States" and "continues to supply North America and the world with well-known products").

8. In most cases, personal jurisdiction attaches because items are put directly into forums' streams of commerce. In this case, the focus of the complaint is that items are withheld. Although companies can withhold items to avoid being subject to jurisdiction, *cf. Burger King*, 471 U.S. at 472, 105 S.Ct. 2174 (citing *World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. 559); *Lerfald v. Gen. Motors Corp.*, Ct. File No. CT 03–003327 (Minn.Dist.Ct. Nov. 7, 2003) (slip op.), at 13, withholding some while sending others may constitute activity directed toward a forum that is sufficient to sustain specific jurisdiction.

respect the corporate formalities and look at only the contacts of the particular corporate defendant sued, not concern itself with what corporate parents, subsidiaries or siblings may have done.

On this motion, I am dealing with Canadian corporate defendants who are not themselves the parent companies.

### (i) Daimler Canada

Daimler Canada manufactures motor vehicles in Canada and sells them to DaimlerChrysler Motors Co., LLC ("Daimler Motors"), its corporate grandparent.[9] Daimler Canada's Mot. to Dismiss, Fenn Aff. ¶ 8 (Docket Item # 52). Daimler Motors purchases and takes title to those vehicles in Canada, and then imports them into the United States. *Id.* (These are the higher priced vehicles.) Daimler Canada's website states that Daimler Canada manufactures vehicles for both the American and Canadian markets, and in addition manufactures some vehicles solely for United States distribution. Maier Aff., Ex. 3. *See also id.,* Ex. 20.

In addition, the evidence shows that Canadian DaimlerChrysler dealers enter into non-export agreements with their consumers. *See id.,* Ex. 14. Purchasers sign these non-export agreements warranting that the vehicle they buy is for use in Canada and not for export. *Id.* They must agree not to export the vehicle from Canada or enter into an agreement whereby the vehicle is leased or sold for use outside of Canada. *Id.* (These are the lower priced vehicles.) On March 1, 2002, Daimler Motors sent a notice to dealers on both sides of the border that vehicle distribution outside the "dealer network" was unaccepta-

ble and that Daimler Canada would not provide warranty coverage for vehicles exported from Canada to the United States. *Id.,* Ex. 15. *See also id.,* Ex. 16.

This evidence of targeted distribution and non-export agreements to ensure that only the higher priced version of the same product can be sold to American consumers meets the standard for personal jurisdiction described in *World–Wide Volkswagen.* There, the Supreme Court held that if the sale of a manufacturer's or distributor's product is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly a geographic market, it is not unreasonable to subject the manufacturer or distributor to suit if its merchandise has there been the source of alleged injury. *See World–Wide Volkswagen,* 444 U.S. at 297–98, 100 S.Ct. 559. Daimler Canada has purposefully directed activities toward residents of the United States and this lawsuit arises from economic injuries that arise out of or relate to those activities.

In addition, the gestalt factors align in favor of finding jurisdiction over Daimler Canada. Daimler Canada manufactures vehicles in Canada that are eventually exported to the United States market, and its "center of gravity" is not "located at an appreciable distance from the forum." *Ticketmaster–New York,* 26 F.3d at 210. The forum's interest in adjudicating the dispute, the plaintiffs' interest in obtaining convenient and effective relief, the judicial system's interest in obtaining the most effective resolution of the controversy, and the common interests of all sovereigns in promoting substantive social policies are

---

**9.** DaimlerChrysler AG is the parent company of DaimlerChrysler North America Holding Corporation. Daimler Motors is a subsidiary of DaimlerChrysler North America Holding Corporation, and the parent company of DaimlerChrysler Corporation who in turn is the parent company of Daimler Canada. Mercedes–Benz Canada and Mercedes–Benz USA are also subsidiaries of DaimlerChrysler North America Holding Corporation. I am unclear where Mercedes–Benz of North America falls in the corporate structure.

the same as those I discussed in the CADA analysis, or perhaps stronger in favor of jurisdiction.

Here, the evidence for *prima facie* jurisdictional purposes is sufficient to show that Daimler Canada engaged in a two-fold distribution system directed at American consumers. This arrangement is more than mere product placement into the stream of commerce; this Canadian defendant, as evidenced by websites and sales, clearly anticipates that the vehicles it manufactures will be sold in the United States, and it controls the distribution system of Canadian manufactured vehicles so as to avoid competing with those American sales. *See Asahi*, 480 U.S. at 112–13, 107 S.Ct. 1026. I therefore DENY Daimler Canada's motion to dismiss for lack of personal jurisdiction.

### (ii) Toyota Canada

Like Daimler Canada, Toyota Canada distributes vehicles in Canada that are the subject of non-export agreements between Canadian dealers and their customers. Maier Aff., Ex. 13. But non-export agreements alone do not furnish a sufficient basis for specific jurisdiction; Canadian distributors are allowed to put limits on their product placement so as to avoid suit in the United States. *See Burger King*, 471 U.S. at 472, 105 S.Ct. 2174 (citing *World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. 559). The plaintiffs also need to show that Toyota Canada purposefully directed activities toward residents of the forum and purposefully availed itself of the forum's benefits and protections. "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Id.* at 474–75, 105 S.Ct. 2174 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). To that end, the plaintiffs assert that Toyota Canada manufactures vehicles in Canada and exports them to the United States, *see* Maier Aff., Exs. 2, 7. But they provide no competent evidence to support that assertion. Toyota Canada does purchase vehicles from manufacturing plants in the United States, but it does not manufacture vehicles or sell vehicles (directly or indirectly) for American distribution. Toyota Canada's Mot. to Dismiss, Nichols Decl. ¶¶ 6, 8, 20 (Docket Item # 50). The plaintiffs provide evidence that "Toyota" and "Toyota Motor Manufacturing Canada" manufacture vehicles in Canada for export to the United States, Maier Aff., Exs. 2, 7, but they do not provide any evidence that either of these two companies is actually Toyota Canada (or one of its divisions). Instead, Toyota Canada presents uncontradicted evidence that it does not manufacture vehicles in Canada or sell vehicles for distribution in the United States. Nichols Decl. ¶¶ 6, 8. In fact, Toyota Canada states that Toyota Motor Manufacturing Canada, Inc. is a distinct corporation from Toyota Canada and is not a party to this litigation. Defs.' Joint Reply Mem. at 11 and n. 15 (Docket Item # 82) (citing *http:// www.toyota.com/about/operations/na-affiliates/index.html*). In short, the plaintiffs have failed to show on even a *prima facie* basis that Toyota Canada has engaged in a two-fold distribution system purposefully directed toward the American market that would support personal jurisdiction. Unless personal jurisdiction can be substantiated on the basis of co-conspirator activity, which I address later, Toyota Canada should be dismissed.

### (iii) Nissan Canada and BMW Canada

There is no evidence that Nissan Canada or BMW Canada manufactures vehicles in Canada. They do obtain vehicles from manufacturing plants in the United States (BMW Canada through its parent company) for sole distribution in Canada. Nissan Canada's Mot. to Dismiss, Higgins Decl. ¶ 10 (Docket Item # 54); BMW Can-

ada's Mot. to Dismiss, Neville Aff. ¶ 20 (Docket Item # 58). But Nissan Canada and BMW Canada are not manufacturers or sellers to the United States that can control the pricing and flow of vehicles in both the United States and Canada. The plaintiffs provide no evidence that Nissan Canada requires its dealers to use non-export agreements. BMW Canada does distribute vehicles in Canada that are subject to non-export agreements between dealers and their consumers. Maier Aff., Ex. 12. But as I said in the Toyota Canada analysis, distributing vehicles in Canada and even controlling that distribution through non-export agreements are alone insufficient to give defendants "fair warning" that they might be sued in the United States. *See Burger King*, 471 U.S. at 472, 105 S.Ct. 2174 (citing *World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. 559) (noting that defendants can structure conduct with some minimum assurance as to where that conduct will and will not render them liable to suit). Unless personal jurisdiction can be sustained on the basis of co-conspirator activity, addressed later, Nissan Canada's and BMW Canada's motions to dismiss for lack of personal jurisdiction should be granted.

### (iv) Mercedes–Benz Canada

▮ Like Toyota Canada, Nissan Canada and BMW Canada, Mercedes–Benz Canada does not manufacture vehicles in Canada. Instead, it obtains vehicles from manufacturing plants in the United States (through its parent company) for sole distribution in Canada. Mercedes–Benz Canada's Mot. to Dismiss, Leigh Aff. ¶ 9 (Docket Item # 53). Mercedes–Benz Canada does occasionally sell vehicles in Canada to Mercedes–Benz USA, the exclusive

distributor of vehicles into the United States. Mercedes–Benz Canada's Mot. to Dismiss at 3 n. 5; Leigh Aff. ¶ 2. These sales account for less than 0.5 percent of Mercedes–Benz Canada's yearly revenue. *Id.* Is this evidence of a dual distribution channel? The plaintiffs have not provided evidence that Mercedes–Benz Canada requires Canadian dealers to sign non-export agreements limiting the use of vehicles outside of Canada; only that Mercedes–Benz of North America, Inc. signs non-export agreements with North American dealers prohibiting use and export outside of North America. Maier Aff., Ex. 14 at 2. I conclude that jurisdictional discovery is warranted, given the fact that Mercedes–Benz Canada does sell some vehicles for distribution in the United States. I therefore **DEFER** action on Mercedes–Benz Canada's 12(b)(2) motion to dismiss for lack of personal jurisdiction pending jurisdictional discovery on the scope of sales of Mercedes–Benz Canada vehicles into the American market (through Mercedes–Benz USA) and concerning the scope of Mercedes–Benz non-export agreements for Canadian vehicles.

### (c) The Conspiracy Theory of Jurisdiction

▮ The plaintiffs have provided no evidence to support their allegation that Canadian defendants such as Nissan Canada, BMW Canada, Mercedes–Benz Canada and Toyota Canada were present at the March 2002 New York meeting that discussed the export sales issue.[10] Thus, the only remaining basis for maintaining jurisdiction over Nissan Canada, BMW Canada, Mercedes–Benz Canada or Toyota Canada is the so-called conspiracy theory of jurisdiction. Under this doctrine, the

---

**10.** The plaintiffs allege that representatives of the manufacturing defendants attended the 2002 New York Auto Show meeting to discuss the export "problem." *See* Am. Compl. ¶ 66. However, there are no facts alleged with specificity that any of the Canadian defendants' representatives (other than CADA) were at the New York meeting. *See* Maier Aff., Exs. 10, 11.

actions of one defendant are attributed to all the co-conspirators in assessing jurisdictional contacts. (Here, for example, CADA's involvement in the 2002 New York meeting would be attributable to all defendants.) However, the First Circuit has never recognized the conspiracy doctrine. *Glaros v. Perse*, 628 F.2d 679, 682 n. 4 (1980) ("[W]e do not mean to imply that we would adopt [a] rather liberal approach to conspiracy pleading, or to decide that we would recognize a conspiracy theory of jurisdiction at all."). The Supreme Court has labeled the conspiracy doctrine in the venue context as having "all the earmarks of a frivolous albeit ingenious attempt to expand the statute." *Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 384, 74 S.Ct. 145, 98 L.Ed. 106 (1953). As one court has said, using conspiracy as a basis for personal jurisdiction is "[t]hat much more frivolous." *Kipperman v. McCone*, 422 F.Supp. 860, 873 (N.D.Cal. 1976). Another has said that "[t]he conspiracy theory of personal jurisdiction is being rejected by a growing number of courts." *Group Health Plan v. Philip Morris, Inc.*, 1999 U.S. Dist. LEXIS 9640, *16 (D.Minn.). Additionally, scholars have been skeptical of the doctrine's conformance to notions of constitutional due process. *See, e.g.,* Ann Althouse, *The Use of Conspiracy Theory to Establish in Personam Jurisdiction: A Due Process Analysis,* 52 Fordham L.Rev. 234 (1983). *See also* Stuart M. Riback, Note, *The Long Arm and Multiple Defendants: The Conspiracy Theory of In Personam Jurisdiction,* 84 Colum. L.Rev. 506, 533 (1984) (noting that courts have rejected the conspiracy theory of venue virtually unanimously). For these reasons, I do not believe that the First Circuit would recognize a conspiracy theory of personal jurisdiction, whereby jurisdiction can be obtained over nonresident defendants based upon the jurisdictional contacts of co-conspirators.

### III. CONCLUSION

The motions to dismiss for lack of personal jurisdiction of the defendants Canadian Automobile Dealers Association and DaimlerChrysler Canada, Inc. are DENIED.

The motions to dismiss for lack of personal jurisdiction of defendants Nissan Canada, Inc.; BMW Canada, Inc.; and Toyota Canada, Inc. are GRANTED.

Action on Mercedes–Benz Canada's motion to dismiss for lack of personal jurisdiction is DEFERRED pending jurisdictional discovery.

The plaintiffs are allowed limited jurisdictional discovery to determine the scope of sales of Mercedes–Benz Canada vehicles into the American market through Mercedes–Benz USA, whether Mercedes–Benz Canada, Inc. has non-export arrangements with Canadian dealers, and whether Canadian Mercedes–Benz dealers have non-export arrangements with their customers. The Magistrate Judge shall convene a conference of counsel to establish a schedule for this discovery.

So ORDERED.